[Civ. No. 45313. Second Dist., Div. Four. June 4, 1975.]

LINDA CURRIER et al., Plaintiffs and Respondents, v.
CITY OF PASADENA, Defendant and Appellant.

COUNSEL

Wendell R. Thompson, City Attorney, and James O. Kahan, Deputy City Attorney, for Defendant and Appellant.

Hill, Farrer & Burrill, Carl M. Gould, Stanley E. Tobin, William Gorenfeld, Elena H. Ackel, Rosemary R. French, Christopher N. May, Daniel M. Luevano, Rosalyn M. Chapman, Philip L. Goar and Jonathan Lehrer-Graiwer as Amici Curiae on behalf of Defendant and Appellant.

Charles B. Johnson for Plaintiffs and Respondents.

OPINION

**KINGSLEY, Acting P. J.**—This is an appeal by the City of Pasadena from a judgment declaring an ordinance unconstitutional and enjoining its enforcement and from an order denying the city's motion to stay the enforcement of the judgment and to vacate it. For the reasons set forth below, we reverse the judgment and dismiss, as moot, the appeal from the order.

The ordinance herein involved (Ordinance 5121) is an attempt by the city to secure enforcement of its zoning, health and building codes in cases of residential properties. The ordinance applies to, and only to, "a

dwelling unit in a single-family, two-family or multi-family residence building, excluding motels, hotels, rooming and boarding houses and similar living accommodations."[1] It provides that: "No person shall occupy, change the use of or sell, exchange, rent, lease or otherwise permit any unit which is hereafter vacated by the occupant thereof to be re-occupied until a Certificate of Occupancy is issued . . . as hereinafter provided."[2] The ordinance requires the owner of such premises to apply for a certificate[3] and for inspection of the premises within two days after such application[4]; it also provides that "[t]he owner shall be responsible for making the unit available for the inspection by the City."[5] Typical provisions for administrative review of a denial of a permit are included.[6]

Because the ordinance expressly limits its application to residential premises, we lay aside as inapplicable the cases that, after *See* v. *City of*

---

[1]"Section 2. Definitions.

"ADMINISTRATOR means the Housing Administrator of the Community Development Department of City.

"CHANGE OF USE means to occupy a unit for other than a residence for one family as defined in 'The Zoning Plan and Code of the City of Pasadena.'

"CITY means the City of Pasadena.

"OCCUPANT means any person who occupies a unit, whether as an owner, or tenant or permittee of the owner.

"OWNER includes the agent of the owner.

"PERSON means an individual, partnership, corporation or association, or the rental agent of any of the foregoing.

"UNIT means a dwelling unit in a single-family, two-family or multi-family residence building, excluding, motels, hotels, rooming and boarding houses and similar living accommodations."

[2]"Section 3. No person shall occupy, change the use of or sell, exchange, rent, lease, or otherwise permit any unit which is hereafter vacated by the occupant thereof to be re-occupied until a Certificate of Occupancy is issued by the Administrator, as hereinafter provided." As we read subdivision (A) of section 6, a new certificate is not required for changes of occupancy occurring within six months from the issuance of a certificate.

[3]"Section 4. The owner shall file with the Administrator, prior to the sale or occupancy of a premises, a written application for a Certificate of Occupancy on a form to be prescribed by the Administrator, accompanied by the fee therefor."

[4]"Section 5. Within 2 working days after the application is received and the Owner requests an inspection, the Administrator shall cause an inspection of the unit to be made for compliance with City's Housing Code. The Zoning Plan and Code, and other ordinances of said City relating to health and safety of residences. If the unit is in compliance with said codes and ordinances, the Administrator shall issue a Certificate of Occupancy."

[5]"Section 10. The owner shall be responsible for making the unit available for inspection by City."

[6]"Section 11. Any person aggrieved by the determination of the Housing Administrator under this ordinance may appeal to the Housing Advisory and Appeals Board in the manner provided in the Housing Code."

*Seattle* (1967) 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737], have held that that case and *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727], do not bar statutes and ordinances that permit warrantless inspections of certain commercial premises on which are conducted licensed businesses engaged in activities which have a high risk of illegal conduct or of serious danger to the public.[7]

I

This case was decided in the trial court, and respondents seek to support the judgment here, on the theory that the ordinance is unconstitutional because it authorizes warrantless searches of private houses, citing *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727] as authority for that contention. The city contends that the ordinance does not mean that the inspections thereunder would be made without warrant if the applicant for a certificate refused consent to search. The city states in its brief that it recognizes that the ordinance is subject to the provisions of sections 1822.50 through 1822.57 of the Code of Civil Procedure. Read together, the ordinance and the statute require that all inspections under the ordinance could be made only pursuant to a warrant if the owner, whether or not he had applied for a certificate of occupancy, refused voluntarily to consent to the inspection.

We think it clear that, without this concession, the ordinance would be unconstitutional. The ordinance, standing by itself, is more than a civil remedy. As pointed out by the United States Supreme Court in *Camara* (387 U.S. at p. 531 [18 L.Ed.2d at pp. 936-937]): ". . . inspections of the kind we are here considering do in fact jeopardize 'self-protection' interests of the property owner. Like most regulatory laws, fire, health, and housing codes are enforced by criminal processes. In some cities, discovery of a violation by the inspector leads to a criminal complaint. Even in cities where discovery of a violation produces only an administrative compliance order, refusal to comply is a criminal offense, and the fact of compliance is verified by a second inspection, again without a

---

[7]*Air Pollution Variance Bd.* v. *Western Alfalfa* (1974) 416 U.S. 861 [40 L.Ed.2d 607, 94 S.Ct. 2114] (smoke emission observed from open area) (but cf. *Vidaurri* v. *Superior Court* (1970) 13 Cal.App.3d 550 [91 Cal.Rptr. 704]); *United States* v. *Biswell* (1972) 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593] (dealer in firearms); *Colonnade Corp.* v. *United States* (1970) 397 U.S. 72 [25 L.Ed.2d 60, 90 S.Ct. 774] (dealer in intoxicating liquor); *United States* ex rel. *Terraciano* v. *Montanye* (2d Cir. 1974) 493 F.2d 682 (pharmacy dispensing narcotics); *People* v. *Grey* (1972) 23 Cal.App.3d 456, 461 [100 Cal.Rptr. 245] (used car lot); *People* v. *White* (1968) 259 Cal.App.2d Supp. 936 [65 Cal.Rptr. 923] (hospital).

warrant." That comment is equally true here. It follows that the searches herein involved are, like the typical police search, conducted in order to secure evidence of criminal violations. That the city represents that it would not resort to that procedure is immaterial. The ordinance must be judged by what could happen under it.

We also find inapplicable to the case before us two decisions that the city claims have eroded the impact of the *Camara* case hereinafter discussed. In *Wyman* v. *James* (1971) 400 U.S. 309 [27 L.Ed.2d 408, 91 S.Ct. 381], the Supreme Court sustained a requirement that a recipient of public welfare must permit warrantless searches of his residence. *Camara* was distinguished on the ground that, unlike that case and the case at bench, no criminal penalty would result from a refusal and that the only consequence of a refusal of consent was the withdrawal of welfare aid for an act not conforming with the terms of that grant. The case did not, as in *Camara* and here, involve the denial of a constitutional right.

In *People* v. *Hyde* (1974) 12 Cal.3d 158 [115 Cal.Rptr. 358, 524 P.2d 830], our Supreme Court sustained a warrantless search of the person and hand baggage of a boarding passenger at an air terminal. The decision rested on the extreme gravity of the peril sought to be prevented (air "hi-jacking") and on the emergent situation that made the application for search warrants impossible. The case at bench presents no such gravity of peril, nor the impossibility of using warrants. While we do not deny the public interest in the enforcement of zoning, health and building codes, that interest, as we point out below, was the interest held insufficient to justify warrantless searches in *Camara*.

The city contends, at length, that the ordinance involves only consensual entries. The argument is specious. ■ To compel a property owner to let his property lie vacant and to prohibit him from selling it, unless he "consents" to a warrantless search is to require an involuntary consent. The owner's basic right to use and enjoy the fruits of his property cannot be conditioned on his waiving his constitutional rights under the Fourth Amendment and under article I, section 13, of the California Constitution.

We conclude that, except as the ordinance is read together with the statutory provisions for inspection warrants, it could not constitutionally be enforced in the light of the decision in *Camara*.

The ordinance involved in *Camara* read as follows: "Sec. 503 RIGHT TO ENTER BUILDING. Authorized employees of the City departments or

City agencies, so far as may be necessary for the performance of their duties, shall, upon presentation of proper credentials, have the right to enter, at reasonable times, any building, structure, or premises in the City to perform any duty imposed upon them by the Municipal Code." City inspectors, suspecting that *Camara* was occupying residential quarters in a building not zoned for such use, demanded entry into his apartment. After refusals, *Camara* was arrested and charged with a criminal violation of the quoted ordinance. The Supreme Court, overruling *Frank* v. *Maryland* (1959) 359 U.S. 360 [3 L.Ed.2d 877, 79 S.Ct. 804], and *Eaton* v. *Price* (1960) 364 U.S. 263 [4 L.Ed.2d 1708, 80 S.Ct. 1463], declared the ordinance unconstitutional. As in the case at bench, the city attempted to sustain the ordinance on the ground of great public necessity.

■ To that argument the court replied (at p. 533 [18 L.Ed.2d at p. 938]) in language equally applicable here: "The final justification suggested for warrantless administrative searches is that the public interest demands such a rule: it is vigorously argued that the health and safety of entire urban populations is dependent upon enforcement of minimum fire, housing, and sanitation standards, and that the only effective means of enforcing such codes is by routine systematized inspection of all physical structures. Of course, in applying any reasonableness standard, including one of constitutional dimension, an argument that the public interest demands a particular rule must receive careful consideration. But we think this argument misses the mark. The question is not, at this stage at least, whether these inspections may be made, but whether they may be made without a warrant. For example, to say that gambling raids may not be made at the discretion of the police without a warrant is not necessarily to say that gambling raids may never be made. In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search. See *Schmerber* v. *California,* 384 U.S. 757, 770-771. It has nowhere been urged that fire, health, and housing code inspection programs could not achieve their goals within the confines of a reasonable search warrant requirement. Thus, we do not find the public need argument dispositive."

However, we conclude that if, but only if, the ordinance is read and

applied in conjunction with the statutory scheme, it can constitutionally be enforced.[8]

In sections 1822.50 through 1822.57 of the Code of Civil Procedure, the Legislature has set forth a scheme for accomplishing the purposes of the ordinance before us in this case. Those sections provide for the issuance of a warrant of inspection, by a judge of a court of record, on application made to him, in affidavit form, showing "cause" for the desired inspection. In section 1822.52 the Legislature has defined the "cause" which must be shown: "Cause shall be deemed to exist if either reasonable legislative or administrative standards for conducting a routine or area inspection are satisfied with respect to the particular place, dwelling, structure, premises, or vehicle, or there is reason to believe that a condition of nonconformity exists with respect to the particular place, dwelling, structure, premises or vehicle."

■ While those sections are often used to authorize the so-called "area" search, where a particular section of a city, containing many run-down and dilapidated buildings, exists, the statute, by its terms, also applies to "routine" inspections based on reasonable standards. We conclude that it is that portion of the statute which is material here. The City of Pasadena has, by the ordinance before us, provided a "routine" for inspections—namely changes of ownership, occupancy or use involving a vacation of the premises and their reoccupancy by a new owner or lessee. As the briefs before us point out, that scheme provides an on-going check on the observance of the city's zoning, health and housing ordinances, in a manner involving a minimal invasion of privacy. It also permits any corrective action found necessary by the inspection to be performed with minor (and usually no) interference with an occupant. In *Camara,* the United States Supreme Court, after holding warrantless searches unconstitutional in inspection cases, expressly ruled that inspection searches made under the authority of a warrant, if based on reasonable standards, were valid. And, in so doing, that court rejected the contention that the inspection be triggered by a reasonable cause to believe that some improper condition existed in the particular place to be inspected.

## II

As above stated, the city has also appealed from an order of the trial court refusing to stay the enforcement of its judgment and refusing to

---

[8]Cf. *Tellis* v. *Municipal Court* (1970) 5 Cal.App.3d 455 [85 Cal.Rptr. 459], where a similar ordinance was sustained on the same basis as that which we adopt here, namely that the ordinance required the use of a warrant under Code of Civil Procedure sections 1822.50-1822.57.

vacate it. Since our present decision reverses the judgment, the appeal from the order is moot and we dismiss it.

The judgment appealed from is reversed; the appeal from the order is dismissed.

Jefferson, J.,* and Cole, J.,† concurred.

A petition for a rehearing was denied June 24, 1975, and respondents' petition for a hearing by the Supreme Court was denied July 30, 1975.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.