In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-2242 & 04-2487

DH2, INCORPORATED, an
Illinois Corporation,

*Petitioner,*

*v.*

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

*Respondent.*

Petitions for Review of an Order of the
United States Securities and Exchange Commission.
No. 04 C 789

ARGUED NOVEMBER 29, 2004—DECIDED SEPTEMBER 7, 2005

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* These consolidated petitions for review challenge certain rules releases issued by the Securities and Exchange Commission ("SEC") in the wake of New York Attorney General Elliot Spitzer's investigation into abuses in the mutual fund industry. Petitioner DH2, Inc., is an Illinois corporation that trades in mutual funds and makes money by taking advantage of short-term price/value discrepancies that occur when the current value of a fund's portfolio securities has changed and that change is not yet reflected in the fund's share price. That is, DH2 is a "market timer"—a firm that exploits mutual fund

mispricing that occurs when market prices for the fund's underlying securities have become stale due to events after the relevant trading market has closed.

DH2 prefers the term "active trading" to "market timing." Whatever the nomenclature, the practice—a form of arbitrage—is legal, but in an effort to curtail it, the SEC changed its interpretation of the rules regarding how mutual funds calculate their daily prices, and DH2 brought this petition challenging the SEC's actions. In particular DH2 challenges statements made in rules releases issued by the SEC in late 2003 and 2004 requiring mutual fund companies to estimate the current "fair value" of a security when the market price at which that security closed has become unreliable. We conclude that DH2 lacks standing to challenge the SEC's releases and accordingly dismiss the petitions.

## I.  Background

A mutual fund's share price does not fluctuate throughout the trading day, but the prices of the securities held by the fund do. The ever-changing portfolio security prices are aggregated into a single daily fund price known as the net asset value ("NAV"), which is generally fixed by a fund when the major U.S. stock markets close at 4:00 p.m. eastern time (ET). The Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 *et seq.* ("ICA"), requires mutual fund shares to be sold and redeemed at a price that:

> will bear such relation to the *current net asset value* of such security computed as of such time as the rules may prescribe . . . *for the purpose of eliminating or reducing . . . any dilution of the value of other outstanding securities* of such company or any other result of such purchase, redemption or sale which is unfair to holders of such other outstanding securities.

15 U.S.C. § 80a-22(a) (emphasis added). For purposes of computing NAV, the ICA defines "value" as follows: "(i) with respect to securities for which market quotations are readily available, the *market value* of such securities; and (ii) with respect to other securities and assets, *fair value as determined in good faith by the board of directors*[.]" 15 U.S.C. § 80a-2(a)(41)(B) (emphasis added). This case concerns the circumstances under which mutual funds use "fair value" estimates—as opposed to market quotations—for purposes of calculating NAV and setting share price.

The SEC regulates mutual funds under the ICA and investment advisers under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* ("IAA"). The agency is empowered to make rules and regulations "to the same extent, covering the same subject matter, and for the accomplishment of the same ends" as the ICA, and to define "accounting, technical, and trade terms used in this title." 15 U.S.C. §§ 80a-2(c), 80a-37(a).

To that end, the SEC has promulgated rules governing portfolio valuation and share pricing. One of these rules elaborates on the ICA's definition of "value":

> Portfolio securities with respect to which market quotations are readily available shall be valued at *current market value*, and other securities and assets shall be valued at *fair value* as determined in good faith by the board of directors.
>
>  . . . .
>
> [C]alculations made as of the close of the New York Stock Exchange on the preceding business day *may be estimated so as to reflect any change in current net asset value since the closing calculation on the preceding business day*.

17 C.F.R. §§ 270.2a-4(a)(1), (c) (emphasis added). Another

rule establishes a requirement of "forward pricing," prohibiting the issuance or trading of fund shares at any price other than one "based on current net asset value of such security which is next computed after receipt" of a purchase or redemption order. 17 C.F.R. § 270.22c-1(a).

"Forward pricing" was implemented by the SEC in 1968 in order to reduce riskless short-term trading in mutual funds by eliminating the ability to use late-breaking news to take advantage of NAVs fixed before that news was released to the markets. *See United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 710 n.19 (1975); David Ward, *Protecting Mutual Funds From Market-Timing Profiteers: Forward Pricing International Fund Shares*, 56 HASTINGS L.J. 585, 594 (2005). The "forward pricing" principle of Rule 22c-1(a) did not fully achieve its goal, however. "As the number of mutual funds that offered investors the chance to invest in overseas markets grew, a new type of 'backward pricing' abuses began to emerge, one that was possible because mutual funds were increasingly investing in stocks that traded in markets outside the United States." Ward, *Protecting Mutual Funds*, at 594.

For example, in the case of a U.S. mutual fund that invests primarily in overseas securities trading on the London Stock Exchange, the daily NAV would be set at 4:00 p.m. ET using stock prices from the close of the London market at 11:00 a.m. ET—that is, stock prices that are five hours old. In the event that favorable economic news emerged during the interim, arbitrageurs could purchase shares in the fund at an undervalued NAV that did not account for the positive late-breaking news.[1] *See Kircher v.*

---

[1] The potential for exploiting stale market prices increases as one moves east, given the larger time zone disparities between eastern

(continued...)

*Putnam Funds Trust*, 403 F.3d 478, 480-81 (7th Cir. 2005). Under these circumstances, "[a]rbitrageurs . . . make profits with slight risk to themselves, diverting gains from the mutual funds' long-term investors while imposing higher administrative costs on the funds (whose operating expenses rise with each purchase and redemption)." *Id.* at 481.

In response to Attorney General Spitzer's investigation into illegal late trading in the mutual fund industry and the accompanying growing public awareness of the practice of "market timing" arbitrage, the SEC launched a reexamination of the rules governing mutual fund valuation and share pricing. At issue here are certain statements made by the SEC in rules releases issued in late 2003 and 2004 pertaining to the circumstances under which mutual funds must use "fair value" pricing. As described above, the ICA and SEC regulations require funds to use current market quotations in calculating NAV with respect to securities for which such quotations are "readily available," and in all other circumstances to use "fair value" estimations. In December 2003 the SEC adopted a new compliance rule requiring mutual funds and investment advisers to adopt and implement written policies and procedures "reasonably designed to prevent violation of the federal securities laws, review those policies and procedures annually for their adequacy and the effectiveness of their implementation, and designate a chief compliance officer to be responsible for administering the policies and procedures." 68 Fed. Reg. 74714 (Dec. 24, 2003) (the "Compliance Rule"). In April 2004 the SEC adopted a new disclosure rule requiring funds to explain in their prospectuses "the circumstances under which they will use fair value pricing and the effects of using fair value pricing." 69 Fed. Reg. 22300 (Apr. 23, 2004)

---

[1] (...continued)
time and the Japanese or Hong Kong markets.

(the "Disclosure Rule").

The Compliance Rule and the Disclosure Rule are themselves silent regarding the circumstances under which funds should or must use fair value pricing in calculating daily NAV, but the releases issued in connection with the promulgation of the rules contain statements by the SEC that DH2 contends amount to "a new, mandatory requirement—the 'Fair Value Rule,'" promulgated in violation of the requirements of the Administrative Procedure Act ("APA") and contrary to the ICA. The challenged language pertains to the circumstances under which current market quotations are not "readily available" so as to trigger fair value pricing:

> When fund shares are mispriced, short-term traders have an arbitrage opportunity they can use to exploit a fund and disadvantage the fund's long-term investors by extracting value from the fund without assuming any significant investment risk. Mispricing occurs with respect to portfolio securities traded on a foreign market that closes before the time at which the fund prices its shares. If an event affecting the value of the portfolio securities occurs *after* the foreign market closes but *before* the fund prices its shares, the foreign market closing price for the portfolio security will not reflect the correct current value of those securities when the fund prices its shares. In 1984, we stated that, in these circumstances, a fund "*must,* to the best of its ability, determine the fair value of the securities, as of the time" that the fund prices its shares.

68 Fed. Reg. 74718 (Dec. 24, 2003) (emphasis in original) (footnotes omitted) (the "Compliance Rule Release"). The SEC further stated:

> We believe that funds that fail to fair value their

portfolio securities under such circumstances may violate rule 22c-1 under the Investment Company Act. Fund directors who countenance such practices fail to comply with their statutory valuation obligations and fail to fulfill their fiduciary obligations to protect fund shareholders. Accordingly, rule 38a-1 [the Compliance Rule] *requires funds to adopt policies and procedures that require the fund to monitor for circumstances that may necessitate the use of fair value prices; establish criteria for determining when market quotations are no longer reliable for a particular portfolio security;* provide a methodology or methodologies by which the fund determines the current fair value of the portfolio security; and regularly review the appropriateness and accuracy of the method used in valuing securities, and make any necessary adjustments.

*Id.* (emphasis added) (footnotes omitted).

In a release proposing the promulgation of the Disclosure Rule, the SEC reiterated that:

*When market quotations for a portfolio security are not readily available (including when market quotations are unreliable) a mutual fund is required to calculate its NAV by using the fair value of that security, as determined in good faith by the fund's board.* In a separate release adopting rule 38a-1 under the Investment Company Act [the Compliance Rule], we are reemphasizing the obligation of mutual funds to fair value their securities under certain circumstances. If a mutual fund misprices its shares by failing to use fair value pricing when market quotations for its portfolio securities are unreliable, an investor may take advantage of the disparity between the portfolio securities' last quoted price and their fair value. When mutual fund shares are mispriced, short-term traders have an arbitrage opportunity that they can use to exploit the

fund and disadvantage the fund's long-term investors by extracting value from the fund without assuming any significant investment risk, through market-timing. *Mutual funds that fair value their portfolio securities consistent with their obligations can effectively reduce or eliminate the profit that market timers seek to exploit.*

68 Fed. Reg. 70403 (Dec. 17, 2003) (emphasis added) (footnotes omitted) (the "Proposed Disclosure Rule Release"). Finally, in a release in connection with the final adoption of the Disclosure Rule, the SEC explained that:

> [A]ll mutual funds . . . are required to explain briefly in their prospectuses both the circumstances under which they will use fair value pricing and the effects of using fair value pricing. *We are adopting these amendments to clearly reflect that funds are required to use fair value prices any time that market quotations for their portfolio securities are not readily available (including when they are not reliable).*

69 Fed. Reg. 22304-05 (Apr. 23, 2004) (emphasis added) (footnotes omitted) (the "Disclosure Rule Release").

DH2 initially challenged the Compliance Rule Release and the Proposed Disclosure Rule Release in the United States District Court for the Northern District of Illinois, which transferred the case to this court. *See* 15 U.S.C. § 78y (review of final orders of the SEC may be obtained by petition for review "in the United States Court of Appeals for the circuit in which [the person aggrieved] resides or has his principal place of business, or for the District of Columbia Circuit"). This court then construed the original complaint as a petition for review pursuant to § 78y. DH2 eventually filed a second petition challenging the Disclosure Rule Release and the petitions were consolidated. We now conclude that DH2 lacks constitutional standing to bring this challenge.

## II. Discussion

DH2 attacks the foregoing actions by the SEC on several grounds. It contends that the cited language in the Compliance Rule Release, the Proposed Disclosure Rule Release, and the Disclosure Rule Release establish a mandatory "Fair Value Rule," promulgated in violation of the APA's notice-and-comment rulemaking requirements. *See* 5 U.S.C. § 553. DH2 also argues that this new "Fair Value Rule" conflicts with the plain language of the ICA and is arbitrary and capricious. On the merits, the SEC defends the releases as mere interpretive statements not subject to the APA's notice-and-comment requirements and also argues that the releases merely reiterate, albeit with somewhat different language and emphasis, its prior interpretation of the fair value pricing requirements of the ICA.

As a threshold matter, however, the SEC argues that DH2 lacks constitutional standing to bring the current challenge. We agree. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The burden to establish standing is on the party invoking federal jurisdiction—here, DH2—and the elements it must show are:

> (i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relation between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision.

*Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (citing *Lujan*, 504 U.S. at 560-61). To satisfy the injury-in-

fact requirement, DH2 "must establish that [it] has sus-tained or is immediately in danger of sustaining some direct injury." *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004) (quoting *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001)). "Mere speculation is not enough to establish an injury in fact." *Id.*

DH2 is neither an investment company nor an investment adviser and is therefore not subject to the requirements of the Compliance Rule, the Disclosure Rule, or any of the terms of the accompanying rules releases. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). Where, as here, the asserted injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*[,] . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* In this situation "much more is needed" to establish standing, and "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury." *Id.*

DH2 asserts that the "Fair Value Rule" contained in the SEC rules releases "will require the investment companies in which DH2 invests to engage in subjective, estimated pricing of their securities, which, in turn, will cause eco-nomic harm to DH2." That is, the language in the SEC releases will have the general effect of increasing the use of fair value pricing—which DH2 argues is less accurate than market quotations—and the corresponding reduction in the use of market quotations will produce an "economic injury" to DH2's interest as a mutual fund investor. This is

not an injury-in-fact within the meaning of *Lujan*. The interest asserted is not a legally protected one, and the alleged harm is only generalized and conjectural.

Without commenting on the merits or sincerity of DH2's argument that market quotations produce a more accurate NAV than fair value pricing, we are compelled to note the obvious incongruity here: DH2 makes money by exploiting short-term *inaccuracies* that result from market quotations that have become stale due to intervening events. The interest DH2 actually seeks to protect boils down to a purported right to profit by trading in mutual funds based on a particular method of fund valuation—one that gives rise to occasional short-term price/value discrepancies. Of course there is no such right. DH2 does not have a legally protected interest in the perpetuation of a fund valuation formula that preserves its ability to make money in market-timing arbitrage.

Moreover, DH2's asserted injury is not "concrete and particularized," nor is it "actual or imminent." DH2 does not claim that fund shares it now holds are or will become mispriced or diluted as a result of the SEC's actions. DH2 identifies no concrete, particularized injury, relying instead on abstractions about the subjectivity in valuation it believes will flow from fair value estimation. It does not describe its asserted injury beyond characterizing it as "economic" in nature. But the only "economic injury" even arguably at issue here is the diminished availability of a certain sort of arbitrage opportunity, which (to the extent it is an injury at all) is a diffuse and speculative harm that cannot support standing.

Finally, DH2 has not met its burden of establishing the causation and redressability elements of standing. With or without the challenged statements in the SEC releases, mutual funds have the discretion to use fair value pricing in lieu of market quotations when circumstances warrant

the conclusion that market quotations are no longer current. *See* 15 U.S.C. §§ 80a-22, 80a-2(a)(41)(B); 17 C.F.R. § 270.2a-4(a)(1), (c). Thus, to a significant degree, the injury DH2 complains of hinges on the decisions of independent actors whose discretion— though subject to securities laws and regulation by the SEC—is nonetheless quite broad. *See Lujan*, 504 U.S. at 560 ("there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court") (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).

Accordingly, because DH2 has not established constitutional standing to bring this challenge to the SEC rules releases, the petitions for review are DISMISSED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*