In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-4377

MAINSTREET ORGANIZATION OF REALTORS, successor
   by name change to REALTOR ASSOCIATION OF
   WEST/SOUTH SUBURBAN CHICAGOLAND,

*Plaintiff-Appellee,*

*v.*

CALUMET CITY, ILLINOIS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 2271—**Milton I. Shadur**, *Judge*.

———————

ARGUED SEPTEMBER 7, 2007—DECIDED OCTOBER 17, 2007

———————

Before BAUER, POSNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*.  The plaintiff in this civil rights
lawsuit is an association of real estate brokers in a portion
of the Chicago metropolitan area that includes Calumet
City. The City enacted an ordinance that forbids the sale
of a house without an inspection to determine whether it
is in compliance with the City's building and zoning
codes. If it is not, the house must be brought into compli-
ance with the code. Such "point of sale" ordinances are
common. They aim to prevent the surreptitious conversion

of single-family homes to multi-family dwellings and to retard the physical deterioration of the housing stock. *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 836-37 (Ohio 1989); *Butcher v. City of Detroit*, 401 N.W.2d 260, 262 (Mich. App. 1986) (per curiam); *Currier v. City of Pasadena*, 121 Cal. Rptr. 913, 914-15 (App. 1975); see also *Dome Realty, Inc. v. City of Paterson*, 416 A.2d 334, 337-38 (N.J. 1980). The association currently claims that the ordinance deprives homeowners of property without due process of law; other claims have fallen by the wayside. The suit seeks to enjoin the enforcement of the ordinance. The association sought and obtained a preliminary injunction from the district court and the City has appealed.

We do not reach the merits of the suit or express an opinion on them. Real estate brokers, in our judgment, do not have standing to challenge a law that impedes the sale of property they would like to broker; and their associa-tion's standing is derivative from theirs and falls with it. *National Solid Waste Management Ass'n v. Pine Belt Regional Solid Waste Management*, 389 F.3d 491, 497-99 (5th Cir. 2004).

A complication is that there are two different issues of standing. There is Article III standing, which requires just an injury in fact, and "prudential" standing, a more complex, judge-made concept of standing. We think there is standing in the first sense but not the second. There is standing in the first sense because the brokers may well be harmed by the ordinance. By adding to the cost of selling residential property, the ordinance (if allowed to go into effect) is likely to reduce the brokers' commissions in two ways. The higher the cost of selling property, the less property will be sold, and so the fewer commissions the brokers will be paid. And anything that reduces the salability of property reduces its market value, and the

lower the price at which a house is sold the smaller the commission the broker will receive. Of course a seller might try to charge a higher price in order to cover some of the cost of complying with the ordinance, and a broker's commission is normally a percentage of the sale price. But the seller's attempt would fail if indeed the ordinance reduces the value of the property to prospective purchasers.

Against this it can be argued that the ordinance will boost property values in Calumet City and by doing so perhaps make the brokers better off rather than worse off. That is possible, but standing in the Article III sense does not require a certainty or even a very high probability that the plaintiff is complaining about a real injury, suffered or threatened. A suit to redress an injury to the plaintiff is a "case" or "controversy" within the meaning that the courts have imprinted on these words of Article III of the Constitution, *Allen v. Wright*, 468 U.S. 737, 750-51 (1984), as long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress. As we have noted repeatedly, the fact that a loss or other harm on which a suit is based is probabilistic rather than certain does not defeat standing. E.g., *Korczak v. Sedeman,* 427 F.3d 419, 422-23 (7th Cir. 2005); *North Shore Gas Co. v. EPA,* 930 F.2d 1239, 1242 (7th Cir. 1991). Thus, as we said in *Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir. 1995), in reliance on the Supreme Court's decision in *Pennell v. City of San José*, 485 U.S. 1, 8 (1988), "All that a plaintiff need show to establish standing to sue [in the Article III sense] is a reasonable probability—not a certainty—of suffering tangible harm unless he obtains the relief that he is seeking in the suit." A case is not dismissed for failure to invoke federal jurisdiction just

because the plaintiff fails to prove injury. Ordinarily and here the allegation is enough.

It is true that if the federal courts could decide cases brought by persons on whom a defendant's alleged misconduct could not possibly inflict tangible harm, so that a person living in California who read about Calumet City's point of sale ordinance could have brought the present suit, the power of the federal courts relative to the other branches of government would be magnified alarmingly. In *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006), we gave the following example of the kind of case that Article III standing therefore excludes from the federal courts: "[T]here is a sense in which I am 'injured' when I become upset by reading about the damage caused that fine old vineyard in Burgundy by a band of marauding teetotalers, yet that injury would not be an 'injury' that conferred standing to sue under Article III." That is not this case. This is not a case of some abstract psychic harm or a one-day-I'll-be-hurt allegation, as in *Lujan v. Defenders of Wildlife, Inc.*, 504 U.S. 555, 560 (1992). The challenged ordinance is quite likely to delay the sale of homes in the area serviced by the real estate brokers whose association has brought this suit, to reduce sales prices, and thus to reduce the brokers' commissions, and this likelihood of a tangible economic loss to them suffices to confer Article III standing.

But there is also a nonconstitutional doctrine, entirely judge-made, of standing, to which the unilluminating term "prudential standing" has been affixed. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982); *Majors v. Abell*, 317 F.3d 719, 722 (7th Cir. 2003); *Grand Council of Crees v. Federal Energy Regulatory Commission*, 198 F.3d 950, 954 (D.C. Cir.

2000); *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007). This doctrine precludes the federal courts from exercising jurisdiction over some types of case that Article III would not forbid the courts to adjudicate. It is this doctrine that bars the present suit from being adjudicated in a federal court.

The doctrine is various. The strand relevant to this case governs the situation in which the injury on which the plaintiff founds his suit is derivative from the injury suffered by the defendant's immediate victim. Often the harm from a harmful act will ramify far beyond that victim, as the present case illustrates. The initial victims of an ordinance impeding the sale of homes are homeowners who would like to sell—or perhaps all homeowners subject to the ordinance; for as we said, any impairment of the salability of a property reduces its value because salability ("alienability" in an older legal vocabulary) is one of the rights that, along with such other rights as the right to the exclusive enjoyment of the property, make a fee-simple interest more valuable than other interests in property, such as that of a licensee. But anything that impedes the sale of property, and by impeding it reduces the number of sales and the average sale price, harms other people besides the owners. It harms real estate brokers, sure, but it also harms title insurance companies, mortgage lenders, termite inspectors, moving companies, interior decorators, renovators, prospective home buyers, sellers of "for sale" signs, suppliers of paint for the "for sale" signs, lessors of real estate brokers' offices, colleges that the children of real estate brokers can no longer afford to attend because the brokers' incomes have declined (and the children themselves, of course), and so on ad infinitum, or at least ad nauseam. If all these incidental victims could sue, the courts would be over-

whelmed. Moreover, the victims with the largest stakes—namely the homeowners impeded in selling their homes—who are also the potential plaintiffs with the first-hand information about the operation of the ordinance, are likely to be trampled in the rush to the courthouse. It is not only in bankruptcy that "clouds of persons indirectly affected by the acts and entitlements of others may buzz about, delaying final resolution of cases." *In re Deist Forest Products, Inc.*, 850 F.2d 340, 341 (7th Cir. 1988).

The brokers' suit thus is barred by the principle that, subject to certain exceptions, one cannot sue in a federal court to enforce someone else's legal rights. *Id.*; *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 17-18 (2004); *Warth v. Seldin*, 422 U.S. 490, 508-10 (1975); *Massey v. Helman*, 196 F.3d 727, 740-42 (7th Cir. 1999). The brokers are not suing to enforce their constitutional property rights; they have no rights in commissions they may someday earn on sales of property with whose owners they have as yet no brokerage contract. They are suing to enforce the property rights of the owners of residential property. A member of the plaintiff association who had a brokerage contract with a homeowner harmed by the ordinance might be able to argue that the contract gave him (the broker) a property right of which he was being deprived. But that is not the claim; the claim is that the broker can litigate the alleged deprivation of the homeowner's property right. No doubt some members of the association own homes in Calumet City, since they work there. But the association that is the plaintiff in this case is suing on behalf of its members' interests as brokers, not as homeowners.

We mentioned exceptions. *Craig v. Boren*, 429 U.S. 190, 193-94 (1976), is illustrative. A liquor dealer who wanted to

sell beer to males under the age of 21 because females could buy it at age 18 claimed that the difference in eligibility was a denial of equal protection. He thus was trying to litigate a constitutional claim belonging to someone else. But the statute he was challenging was aimed at liquor dealers and so he had as definite a stake in the vindication of the claim as a doctor forbidden by law to perform an abortion has in vindicating his patients' right to undergo the procedure. See *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *U.S. Dept. of Labor v. Triplett*, 494 U.S. 715, 720 (1990); *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 954-58 (1984); *Singleton v. Wulff*, 428 U.S. 106, 113-18 (1976) (plurality opinion). He was an immediate rather than a remote victim. In contrast, Calumet City's ordinance imposes no duties or sanctions on real estate brokers.

We need not worry that unless the doctrine limiting third-party standing is bent in this case there will be nobody to obtain a ruling on the constitutionality of the Calumet City ordinance. Compare *Lepelletier v. FDIC*, 164 F.3d 37, 43 (D.C. Cir. 1999). Even if the harm to the individual homeowner who encounters delay and expense in selling his house because of the ordinance is too slight to motivate him to bear the expense of bringing a lawsuit, all the homeowners in Calumet City can be joined in a class action, since all will have suffered a possible diminution in the value of their property as a result of the ordinance. As there is no hindrance to the primary victims' enforcing their rights, there is no reason to allow the brokers into the litigation arena. See *Kowalski v. Tesmer*, *supra*, 543 U.S. at 131. Hindrance would be the effect of allowing this suit to go forward.

It would be more perspicuous to describe the doctrine that bars the brokers at the threshold as that of *remoteness*,

and illustrate it with reference to the rule of antitrust law that denies the right of a purchaser from a cartel's customers to sue the cartel for damages even if the customer passed on the cartel overcharge to their purchasers. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). There is Article III standing, but there is no right to sue—not because there is no antitrust violation, but because it is efficient to confine the right to suit to the immediate customer of the cartel rather than to multiply the number of plaintiffs and burden the court with having to apportion damages between the first and second tiers of purchasers.

Notice that while the practical objections to allowing the second-tier purchaser to sue are identical to the objections to allowing someone harmed by the infringement of another's rights to sue, the antitrust case doesn't fit squarely into the "no-third-party-standing" pigeonhole. The second-tier purchaser is not complaining about the cartel's violation of the first-tier purchasers' rights; he is claiming that he too has a right under antitrust law not to be victimized (even if indirectly) by a cartel. If we don't want him to be allowed to sue we can *say* he has no right under antitrust law and thus turn it into a third-party case. But it is cleaner to say that the injury is too remote; that the first-tier purchaser has better information about the presence of cartel pricing and should therefore have the right to sue, as there will be better enforcement that way. Similarly, the brokers' injury in this case is too remote to sustain standing even if they might be thought to have a property right, perhaps in contracts that they have signed with homeowners who want to sell but because of the ordinance are less likely to be able to do so at an attractive price. The cases differ because the brokers are not seeking damages, and therefore the issue

of apportionment presented by the antitrust case does not arise. But the problem of allowing a derivative victim to preempt the claims of the immediate victim is the same in both cases.

The only wrinkle in this case is that the City did not argue remoteness until we raised the issue at oral argument. And because the remoteness doctrine is not jurisdictional in the sense that Article III standing is—if there is no Article III standing, the court is obliged to dismiss the suit even if the standing issue has not been raised—it may seem that it can be waived or forfeited just like any other nonjurisdictional defense to a suit.

But nonconstitutional lack of standing belongs to an intermediate class of cases in which a court can notice an error and reverse on the basis of it even though no party has noticed it and the error is not jurisdictional, at least in the conventional sense. Another example is the failure of a petitioner for federal habeas corpus to have exhausted his state remedies. Even when exhaustion is not a jurisdictional prerequisite to judicial review, the court can in its discretion dismiss for failure to exhaust. *Granberry v. Greer*, 481 U.S. 129, 130-33 (1987); see also *Champagne v. Schlesinger*, 506 F.2d 979, 982 (7th Cir. 1974) (failure to exhaust administrative remedies); *Taylor v. United States Treasury Dept.*, 127 F.3d 470, 477 (5th Cir. 1997). Abstention in favor of another court or an agency is still another example of a doctrine that a court can invoke on its own initiative in a case that is within its jurisdiction. *Bellotti v. Baird*, 428 U.S. 132, 143 n. 10 (1976); *International College of Surgeons v. City of Chicago*, 153 F.3d 356, 360-61 (7th Cir. 1998); *San Remo Hotel v. City & County of San Francisco*, 145 F.3d 1095, 1105 (9th Cir. 1998).

Those are not cases about remoteness; what connects them to our case is the presence of interests that are not

represented by the parties, whether the interests of missing parties (such as homeowners, in this case) or the independent interests of the court. When judicial or administrative remedies have not been exhausted, the court is at risk of making an ill-informed ruling because it lacks the benefit of another tribunal's expertise; or an unnecessary ruling because the agency might have resolved the case and the loser not have sought judicial review; or a ruling that gratuitously affronts another judicial system. As we said in *Waldron v. McAtee*, 723 F.2d 1348, 1351 (7th Cir. 1983), "when a court abstains in order to avoid unnecessary constitutional adjudication ('*Pullman*' abstention, after *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496 (1941)), it is not seeking to protect the rights of one of the parties; it is seeking to promote a harmonious federal system by avoiding a collision between the federal courts and state (including local) legislatures."

In a typical case of remoteness, such as the cartel case that we mentioned, the cartel's members may not care which tier of purchasers sues them. Neither may Calumet City care whether it is sued by real estate brokers or homeowners. Indeed, in both cases the defendants might prefer the derivative victim to sue, because his stake may be smaller than the immediate victim's stake, or, being at a further remove from the alleged misconduct than the immediate victim, he may be a less informed and therefore less effective plaintiff. The immediate victim is harmed the most and knows the most, but is not before the court to assert his interest in controlling litigation against the wrongdoer.

Because what we are calling the doctrine of remoteness is a method of judicial protection of absent parties or other unrepresented interests, a court can invoke it on its own

initiative, as many cases make clear. See, e..g., *Delorme v. United States*, 354 F.3d 810, 815 (8th Cir. 2004); *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357-58 (D.C. Cir. 2000); *Community First Bank v. National Credit Union Administration*, 41 F.3d 1050, 1053 (D.C. Cir. 1994); *Thompson v. County of Franklin*, 15 F.3d 245, 247-49 (2d Cir. 1994). It is true, as pointed out in a careful discussion in *UPS Worldwide Forwarding, Inc. v. United States Postal Service*, 66 F.3d 621, 626 n. 6 (3d Cir. 1995), that the issue has not been definitively resolved by the Supreme Court. But the Court signaled its answer in *Warth v. Seldin, supra*. It explained that the bar against third-party standing is "founded in concern about the proper—and properly limited—role of the courts in a democratic society," that it sets "limits on the class of persons who may invoke the courts' decisional and remedial powers," and that both Article III standing and prudential standing "are threshold determinants of the propriety of judicial intervention." 422 U.S. at 498-99, 518. Note also the statement in *Allen v. Wright, supra*, that *both* sorts of standing place "limits on the exercise of federal *jurisdiction*." 468 U.S. at 751 (emphasis added).

A sentence in *Lindley v. Sullivan*, 889 F.2d 124, 129 (7th Cir. 1989), could be read to say that a party's failure to object to third-party standing bars judicial consideration of it. But that would not be a correct reading. For what we meant was simply that such a failure is a ground for refusing to consider the doctrine. This must be the correct interpretation because the sentence is not elaborated and the only authority cited for it is the Supreme Court's opinion in *Craig v. Boren, supra*, 429 U.S. at 193-94, which holds that failure to invoke the doctrine is a ground for refusing to invoke it, not that it bars invocation. And the

court in *Lindley* went on to hold that the requirements of nonconstitutional standing had been satisfied. That would have been inconsistent with its saying that it had no power to address the issue unless it were raised by a party.

*Lindley* has twice been cited by this court for the proposition that a court is barred from raising a prudential-standing issue on its own initiative. *MacLauchlan v. Prudential Ins. Co. of America*, 970 F.2d 357, 359 n. 1 (7th Cir. 1992); *United Transportation Board v. Surface Transportation Board*, 183 F.3d 606, 610-11 (7th Cir. 1999). In *United Transportation*, as in *Lindley*, the opinion goes on to discuss whether the requirements of nonconstitutional standing are satisfied and concludes that they are. The opinion says, moreover, only that the standing issue was "waived," which is not quite the same as saying that the court could not reach it—which in fact it did. *MacLauchlan* does state flatly, albeit in a footnote, that "we may not raise prudential standing issues *sua sponte*." But in the curious circumstances of that case we think the statement should be regarded as dictum rather than holding. The plaintiff was the widow of a man who had applied for a life insurance policy and died before the application was approved. The widow argued that the insurance company (the defendant) was legally obligated to issue the policy and that therefore she was entitled to a judgment for the proceeds. Apparently she had not been named in the application as a beneficiary, so there was a question of her right to sue. The district court rejected the suit on the merits without bothering to determine her right to sue, and the insurance company, which had raised the issue in the district court, abandoned it in our court, which agreed with the district court that the suit had no merit. There would have been no point to our raising the issue of prudential standing; it would simply have delayed the resolution of an obviously meritless appeal.

Because the real estate brokers and their association do not have standing to challenge the Calumet City point of sale ordinance, the preliminary injunction issued by the district court is vacated and the suit is dismissed without prejudice.

SYKES, *Circuit Judge*, concurring. I agree with my colleagues that the preliminary injunction must be vacated and the case dismissed for lack of standing. The court's analysis of prudential standing doctrine is comprehensive, and I join the panel's conclusion that the plaintiff's alleged injury is too remote to permit it to litigate this constitutional claim. I disagree, however, that the plaintiff has gotten over the first hurdle of establishing constitutional standing; Article III's case-or-controversy requirements are not met here.

The MainStreet Organization of Realtors ("the Association") brought this action seeking declaratory and injunctive relief to "redress the deprivation . . . of rights guaranteed to the Realtor Association, its Members, and the citizens of [Calumet City] by the Fourth, Fifth and Fourteenth Amendments." These deprivations, according to the complaint, were caused by the City's point-of-sale code compliance ordinance. The Fourth Amendment claim alleged that the ordinance impermissibly subjects the City's property owners to warrantless inspections; the Fifth Amendment claim alleged unconstitutional takings of

property without just compensation; and the Fourteenth Amendment claims alleged that the ordinance violates equal protection and deprives the owners of their property without due process of law. Only the due process claim remains.

The district court granted the Association's motion for a preliminary injunction prohibiting the City from enforcing the ordinance. The City responded by amending the ordinance. The district court then dissolved the first injunction as moot but was dissatisfied with the City's efforts and entered a second injunction prohibiting enforcement of the amended ordinance. The amended ordinance, like its predecessor, requires that real property in the City be inspected for compliance with the City's building and zoning codes before it is sold. Generally speaking, ownership may not be transferred until the property complies with building and zoning codes or adequate provision is made to bring the property up to code. As the court notes, point-of-sale ordinances like this one are common building and zoning code enforcement measures and are aimed at maintaining the quality of municipal housing stocks.

As to associational standing (*see Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)), the Association alleged that the City's point-of-sale ordinance "adversely affect[ed]" its member-brokers' "ability to consummate real estate transactions." The bulk of the Association's complaint, however, is devoted to the effect of the ordinance on the rights of the City's property owners, *not* the Association's members. The same is true of the Association's motion for a preliminary injunction. The district court gave the question of the Association's standing short shrift, summarily concluding that "the interest that . . .

[the Association's members] are entitled to protect is essentially their business interest. It's a deprivation of the ability to earn commission[s] on sales."

The court appears to reject this holding—rightly, I think—for the rather obvious reason that the Association's members "have no rights in commissions they may someday earn on sales of property with whose owners they have as yet no brokerage contract." Majority op., at 6. But the court also concludes that the possibility of reduced future commissions—commissions the brokers have no arguable legal right or expectation to receive—is enough to confer constitutional standing. I cannot see how this can be reconciled.

It is clear, as the court notes, that "Calumet City's ordinance imposes no duties or sanctions on real estate brokers." Majority op., at 7. The very nature of the claims initially asserted—warrantless property inspections, unconstitutional takings of property, deprivations of property in violation of equal protection and due process—demonstrates that the rights the ordinance is alleged to infringe belong to the property owners, *not* the real estate brokers. As such, the court concludes (and I agree) that "[t]he brokers are not suing to enforce their constitutional property rights[,] . . . [t]hey are suing to enforce the property rights of the owners of residential property." Majority op., at 6. But this means the Association has failed to establish Article III standing, not just that prudential standing considerations preclude this suit, as the court concludes. An injury to the City's real property owners does not confer standing on the City's real estate brokers simply because they are collaterally affected. Without some cognizable injury to *their own rights,* the brokers (and derivatively, the Association) lack consti-

tutional standing to sue, and judicial policy governing third-party standing does not come into play.[1]

"The 'core component' of the requirement that a litigant have standing to invoke the authority of a federal court 'is an essential and unchanging part of the case-or-controversy requirement of Article III.' " *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861 (2006) (quoting *Lujan v. Defenders of Wildlife, Inc.*, 504 U.S. 555, 560 (1992)). The "threshold question in every federal case" is "whether the plaintiff has 'alleged such a *personal* stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial

---

[1] Prudential standing considerations generally prohibit "a litigant's raising another person's legal rights," *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004), but this doctrine kicks in to bar suit (or not) only *after* the litigant has established his own Article III standing to sue. In *Newdow*, for example, the plaintiff established constitutional standing to challenge the practice of daily recitation of the Pledge of Allegiance in his daughter's school as an unconstitutional interference with his right as a parent to direct the religious education of his daughter. *Id.* at 9-10. The Supreme Court concluded that although Article III requirements were met, prudential considerations required dismissal of the father's suit because a state court had awarded legal custody to the child's mother, depriving the father of his right under state law to sue to vindicate his daughter's rights as her "next friend." *Id.* at 17-18. The Court held: "In our view, it is improper for the federal courts to entertain a claim by a plaintiff whose standing to sue is founded on family law rights that are in dispute when prosecution of the lawsuit may have an adverse effect on the person who is the source of the plaintiff's claimed standing." *Id.* at 17.

powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (emphasis added) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). This is because "[t]he Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Id.* at 499.

The familiar requirements of Article III standing are: "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and internal quotations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* (internal quotations omitted). And "[t]hird, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations omitted). Thus, a federal court's jurisdiction "can be invoked *only* when the plaintiff *himself* has suffered 'some threatened or actual injury resulting from the putatively illegal action.' " *Warth*, 422 U.S. at 499 (emphasis added) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)).

The Supreme Court has made it clear that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish. *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). Where the "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*[,] . . . causation and

redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps the response of others as well." *Id.*; *see also DH2, Inc. v. U.S. S.E.C.*, 422 F.3d 591, 596 (7th Cir. 2005). "In this situation, 'much more is needed' to establish standing . . . ." *DH2, Inc.*, 422 F.3d at 596 (quoting *Lujan*, 504 U.S. at 562).

Finally, "[t]he party invoking federal jurisdiction bears the burden of establishing the[ ] elements" of standing. *Lujan*, 504 U.S. at 561; *see also DaimlerChrysler*, 126 S. Ct. at 1861 n.3. These are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the pleading stage, the plaintiff must allege facts that, assuming their truth, would establish the injury-in-fact elements necessary to support standing. At summary judgment, those facts must be supported in the usual way (by affidavit or other evidence), and at trial they must be proven. *Id.*

In light of these well-established principles, it is hard to understand the court's categorical statement that a "case is not dismissed for failure to invoke federal jurisdiction just because the plaintiff fails to prove injury." Majority op., at 3-4. To the contrary, it is the plaintiff's burden to prove injury-in-fact, *Lujan*, 504 U.S. at 561-62, and cases are often dismissed for failure of the plaintiff to carry that burden. *See, e.g., DaimlerChrysler*, 126 S. Ct. at 1868; *Lujan*, 504 U.S. at 562; *Winkler v. Gates*, 481 F.3d 977, 988 (7th Cir. 2007); *DH2, Inc.*, 422 F.3d at 596-97. Also, I cannot agree with the court's view that "[o]rdinarily

and here the allegation [of injury] is enough," as long as "there is some nonnegligable, nontheoretical, probability of harm." Majority op., at 3-4. This treats the constitutional minimums as trifling requirements easily satisfied by almost any allegation of injury, leaving only prudential standing considerations to be consulted. But the Supreme Court has long emphasized that the case-or-controversy requirement is critical to the legitimacy of the court's role: "That requirement states a limitation on judicial power, not merely a factor to be balanced in the weighing of so-called 'prudential' considerations." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("[N]either the counsels of prudence nor the policies implicit in the 'case or controversy' requirement should be mistaken for the rigorous Art. III requirements themselves.").

I do not mean to suggest that "to establish standing a plaintiff must establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit." *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006). Rather, the plaintiff "must have a colorable *claim* to such a right." *Id.* Thus, "[a]lthough standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, . . . it often turns on the nature and source of the claim asserted." *Warth*, 422 U.S. at 500. Accordingly, "[i]t is not enough that he claims to have been injured by the defendant's conduct. 'The alleged injury must be legally and judicially cognizable.' " *Craddieth*, 442 F.3d at 1024 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). That is, "the injury must be to the sort of interest that the law protects when it is *wrongfully* invaded." *Id.*

This case advanced beyond the pleading stage to the entry of a preliminary injunction, which of course requires

the plaintiff to shoulder the burden of establishing a likelihood of success on the merits. *Christian Legal Soc'y v. Walker*, 453 F.3d 803, 859 (7th Cir. 2006). This includes the elements of standing and usually requires the plaintiff to move beyond mere allegations. But the Association's motion for a preliminary injunction did no more than rely on the complaint, almost all of which, as I have noted, pertains to the rights of the City's property owners. As to its members' interests, the Association alleged only that the point-of-sale ordinance adversely affected its members' ability to consummate real estate transactions. This is not a legally protected interest; the brokers do not have a generalized right to consummate real estate transactions or earn commissions.

It is certainly true as a practical economic matter that real estate brokers have an interest in consummating as many transactions as they can at the highest prices possible so as to maximize the amount of commissions they earn. But this is nothing more than an aspiration, not an expectation or right; no law, state or federal, protects this interest. That the point-of-sale ordinance has the potential to reduce commissions does not alone establish injury for purposes of constitutional standing; the Association must establish that the brokers' interest in future commissions is "the sort of interest that the law protects when it is *wrongfully* invaded." *Craddieth*, 442 F.3d at 1024. It has not done so. The brokers do not have a colorable due process claim to future commissions; the Association does not argue otherwise. Indeed, the Association has invoked *no* principle of law—constitutional, statutory, or common law—as an arguable source of legal protection for its members' interests. The injury asserted here, while perhaps a plausible practical one, is not "legally and judicially

cognizable." *Raines*, 521 U.S. at 819. Without a claim of injury to a legally protected interest, the brokers cannot establish Article III standing.

Moreover, because the point-of-sale ordinance regulates real property owners, not brokers, the claim asserted here arises from the City's allegedly unconstitutional regulation of someone *other than* the Association's members, and "much more is needed" to establish standing. *Lujan*, 504 U.S. at 562. The attenuated injury asserted by the Association is insufficient to satisfy this standard. The brokers' alleged injury (even assuming it is legally cognizable and judicially redressable) depends upon the independent action of third parties not before the court—namely, the property owners upon whom the ordinance operates, building inspectors and zoning authorities, and prospective buyers of real property in the City who are just as likely to pay more, not less, for property that complies with the City's codes. This is too conjectural to satisfy the "much more" that is needed to establish standing where the challenged regulation burdens someone other than the plaintiff.

In short, the brokers' alleged injury is "a diffuse and speculative harm," and more fundamentally, the "interest asserted is not a legally protected one." *DH2, Inc.*, 422 F.3d at 596-97. The suit therefore must be dismissed for lack of Article III standing. Of course, my disagreement with my colleagues on this point means only that the case is doubly dismissible; I join the court's conclusion that prudential third-party standing doctrine bars the Association from bringing this claim. But if the Supreme Court's recent standing jurisprudence means anything, it is that constitutional standing prerequisites are to be closely monitored and scrupulously enforced. *See Hein v. Freedom*

*from Religion Found.*, 127 S. Ct. 2553, 2562 (2007) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (quotation omitted); *DaimlerChrysler*, 126 S. Ct. at 1861 ("The case-or-controversy limitation is crucial in maintaining the tripartite allocation of power set forth in the Constitution.") (internal quotations omitted). This is (or should be) true even when there is a prudential doctrine handy to guard against unwarranted extensions of judicial authority. I see little reason to think the Court would be inclined to relax the constitutional minimums in third-party standing cases.

The "federal courts sit 'solely[ ] to decide on the rights of individuals,' " *Hein*, 127 S. Ct. at 2562 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803)), "and must 'refrai[n] from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it.' " *Id.* (quoting *Valley Forge*, 454 U.S. at 474). The brokers' rights are not at issue here; their Association therefore is not entitled to litigate the question of the constitutionality of the City's point-of-sale ordinance. I join the court in vacating the preliminary injunction and dismissing the suit, but for lack of constitutional, as well as prudential, standing.

No. 06-4377                                                    23

A true Copy:

    Teste:

                           _____
                             *Clerk of the United States Court of*
                             *Appeals for the Seventh Circuit*