# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-1858

AURORA LOAN SERVICES, INC.,

*Plaintiff*,

*v.*

FRANK CRADDIETH and PEGGY CRADDIETH,

*Defendants-Appellees*.

APPEAL OF:

MIDWEST REAL ESTATE INVESTMENT COMPANY,

*Intervenor-Appellant*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4325—**Samuel Der-Yeghiayan**, *Judge*.

_____

ARGUED OCTOBER 24, 2005—DECIDED MARCH 31, 2006

_____

Before POSNER, WILLIAMS, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal by Midwest Real Estate Investment Company arises out of a diversity suit to foreclose a mortgage that Aurora, the plaintiff, owned on the Craddieths' home. The substantive issues are governed by Illinois law.

The suit was filed, and a foreclosure judgment entered, in 1999. But for reasons that are unclear, the foreclosure sale was not conducted until October 2004. Midwest was the high bidder, bidding $107,818.44. (The appraised value of the property was $170,000.) However, two or three weeks before the sale the Craddieths had obtained alternative financing that would have enabled them to retain their home: They had arranged for a loan in the form of a sale. They would sell their home to a third party pursuant to an installment land contract that provided that the "buyer" would hold the title to the property until the Craddieths had made their final payment of the sale price, that is, had fully repaid the loan, at which point the title would revert the Craddieths.

On the morning of the day of the foreclosure sale, the Craddieths' lawyer notified the court that his clients had made an alternative arrangement for paying back Aurora. But he mistakenly described the alternative as a "real" sale of the home to someone other than Midwest, rather than as a financing arrangement that would allow the Craddieths to keep their home. The judge, thinking that therefore the Craddieths were "going to be out of their house no matter what," refused to stop the foreclosure sale, at which Midwest was the high bidder. Midwest tendered the $107,818.44 purchase price to the court official who had conducted the sale, and the official issued Midwest a certificate of sale.

But before Midwest could take title to the property the foreclosure sale had to be confirmed by the district court. On November 16 the district judge convened a hearing on Aurora's motion to confirm the sale to Midwest. At the hearing, at which Midwest was not present, it was revealed that the Craddieths had indeed found a lender who was willing to pay the amount due Aurora on the

mortgage. On December 21, the judge formally denied Aurora's motion to confirm the sale.

Eight days later, Midwest moved the district court for leave to intervene in the foreclosure suit under Rule 24(a) of the Federal Rules of Civil Procedure. Without ruling on the motion, the judge vacated the foreclosure judgment, explaining "I'm not going to allow this poor man who has lost his house due to a fault of attorney problems and now he's willing to pay the amount—he's lived there 23 years—just his house to be basically taken away from him." For what had seemed inevitable to the judge—the loss of the Craddieths' home either to Midwest or to the substitute "buyer"—now seemed preventable. Later, the Craddieths' lender having paid off Aurora's mortgage, the judge dismissed the foreclosure suit, whereupon he also dismissed all pending motions, including Midwest's motion to intervene, on the ground that they were moot in light of that dismissal.

So Midwest has appealed; but it must overcome a series of jurisdictional obstacles before we can consider the merits of the appeal. There is first a question whether Midwest had standing to intervene in the district court under Rule 24(a)(2) of the civil rules. (There is no contention that it might qualify for intervention as a matter of right under Rule 24(a)(1), and we need not consider whether it might have a compelling case for permissive intervention, under Rule 24(b).) If it did not have standing, it has no right to appeal the dismissal of the suit. "The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997); see also *Diamond v. Charles*, 476 U.S. 54, 68

(1986); *Korczak v. Sedeman*, 427 F.3d 419 (7th Cir. 2005); *Tachiona v. United States*, 386 F.3d 205, 211 (2d Cir. 2004).

Rule 24(a)(2) entitles a person to intervene who "claims an interest relating to the property or transaction which is the subject of the action," provided that the outcome of the suit would impair his ability to protect that interest and his interest is not adequately protected by an existing party. There was no doubt that Midwest's ability to protect its interest in acquiring the Craddieths' house would be impaired unless it intervened and that no existing party to the foreclosure suit would protect Midwest's interest—Aurora was indifferent (it was going to be paid in full either by Midwest or by the Craddieths' new lender) and the Craddieths opposed. The question is whether Midwest had the kind of "interest" that Rule 24(a)(2) requires.

To be entitled to intervene under that provision, with the full rights of a party including (critically in this case) the right to appeal, the applicant's interest must be one on which an independent federal suit could be based, consistent with Article III's requirement that only a case or controversy can be litigated in a federal court at any stage of the proceeding. *Arizonans for Official English v. Arizona*, *supra*, 520 U.S. at 64-65; *Korczak v. Sedeman*, *supra*, 427 F.3d at 421-22. The interest must be a claim to a legally protected right that is in jeopardy and can be secured by the suit. E.g., *Tachiona v. United States*, *supra*, 386 F.3d at 211; *City of Cleveland v. Nuclear Regulatory Commission*, 17 F.3d 1515, 1516-17 (D.C. Cir. 1994) (per curiam). The principle is one of federal law but the nature and extent of the interest that a foreclosure-sale certificate confers, and therefore whether it can be the ground of a federal suit, depend on the law that defines the rights that such a certificate creates. *FMC Corp.*

*v. Boesky*, 852 F.2d 981, 993 (7th Cir. 1988); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981 (11th Cir. 2005); *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001). In this case, that is the law of Illinois. So we look to that law to see whether the holder of the certificate has the kind of stake that Article III requires.

The right that the certificate confers resembles the right created by a contract for the purchase of land. Such a contract does not confer ownership of the land, but normally one can bring a suit for specific performance if the seller reneges, and the suit if successful will compel the seller to hand over to the buyer the title to the property. *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1225 (7th Cir. 1993). Of course there are defenses to a suit to enforce a contract, but no one would suppose that the fact that a contract claim may fail deprives the suitor of a solid "interest" in the contract, interest enough certainly to justify intervention under Rule 24(a)(2). Otherwise Article III would bar most federal court actions for breach of contract even when the requirements of diversity jurisdiction were satisfied.

Similarly, although there are defenses to the confirmation of a foreclosure sale, they are limited by statute to lack of notice; the terms of the sale were unconscionable; the sale was conducted fraudulently; or "justice was otherwise not done." 735 ILCS 5/15-1508(b). The first three defenses would be normal defenses in a contract case. The last is pretty open-ended, though this depends in part on what exactly "doing justice" means in this context. We examine that issue later; suffice it here to say that it is not so open-ended as to make the interest conferred by a foreclosure-sale certificate illusory. It is a solid legally protected interest, its solidity being further suggested by the

fact that the vast majority of foreclosure sales are confirmed routinely. Basil H. Mattingly, "The Shift from Power to Process: A Functional Approach to Foreclosure Law," 80 *Marquette L. Rev.* 77, 114 (1996). In *Colon v. Option One Mortgage Corp.*, 319 F.3d 912, 921 (7th Cir. 2003), we called the interest of the high bidder at the foreclosure sale "a potentially binding contract," and explained that "under [Illinois] state law, after the completion of the judicial sale, assuming that the redemption period has run, the purchaser at that sale has a presumptive right to eventual ownership of the property, a right contingent on the highly circumscribed authority of the state court to void the sale on any of the four grounds set forth in the statute."

Twice, Illinois appellate courts have held that the high bidder at a foreclosure sale has a legally protected interest even though that interest "evaporates upon the trial court's determination that the judicial sale will not be confirmed." *Citicorp Savings v. First Chicago Trust Co.*, 645 N.E.2d 1038, 1043-45 (Ill. App. 1995); *Commercial Credit Loans, Inc. v. Espinoza*, 689 N.E.2d 282, 287 (Ill. App. 1997). Citing *Citicorp*, the court in *Espinoza* said that "as certified high bidders in the foreclosure sale of Espinoza's property, appellants have some interest in litigation involving the property. High bidders should be able to pursue their appeal." *Id*. The court in *Citicorp* had said that "it is settled law that a non-party may bring an appeal when that person has a direct, immediate and substantial interest in the subject matter, which would be prejudiced by judgment or benefited by its reversal. . . . [I]t cannot be disputed that the Bilanzics were adversely affected by the trial court's order or that they will have the right to the property should the sale be confirmed. This is sufficient to allow the Bilanzics to bring this appeal regardless of the decision by the trial court to deny intervention." 645 N.E.2d at 1044.

The quoted language has, it is true, a procedural rather than a substantive flavor. If all it means is that Illinois procedure allows intervention by high bidders, this cannot rule our decision, because Illinois is under no obligation to conform its criteria for intervention to those of federal law. But what underlies the procedural judgments in these cases is a determination that the high bidder really does have a solid interest, an inference anyway compelled by the statute that delimits the defenses to confirmation of a foreclose sale.

The Craddieths do not contend otherwise. Rather, pointing to the statement in the *Espinoza* and *Citicorp* opinions that "what the trial court decides to do with the property after it determines the sale will not be confirmed is a matter in which the [high bidders] have no discernible legal interest," *Commercial Credit Loans, Inc. v. Espinoza*, *supra*, 689 N.E.2d at 287; *Citicorp Savings v. First Chicago Trust Co.*, *supra*, 645 N.E.2d at 1045, they argue that Midwest lacks standing to challenge the district court's order that vacated the judgment of foreclosure and by doing so cut the ground out from under Midwest's claim. But in both *Espinoza* and *Citicorp* the appellate court reached the conclusion about the high bidder's lack of standing to challenge the reinstatement of the defendant's mortgage only *after* the court determined that the trial court had properly refused to confirm the foreclosure sale—it was *that* determination that extinguished the high bidder's interest in the property. *Id.*; *Commercial Credit Loans, Inc. v. Espinoza*, *supra*, 689 N.E.2d at 287. Until then he had a legally protected interest. A contrary ruling—a ruling confirming the sale—would have perfected rather than extinguished the high bidder's interest, and thus, according to the logic of these cases, would have allowed him to challenge any subsequent reinstatement of the mortgage. The high bidder must be allowed to challenge a rejection of

the sale in order to establish that he indeed has a legally protected interest, namely in obtaining the property for which he was the high bidder.

The point is not that to establish standing a plaintiff must establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit. It is that he must have a colorable *claim* to such a right. It is not enough that he claims to have been injured by the defendant's conduct. "The alleged injury must be legally and judicially cognizable. This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest.'" *Raines v. Byrd*, 521 U.S. 811, 819 (1997), quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); see also *Reid L. v. Illinois State Board of Education*, 358 F.3d 511, 515-16 (7th Cir. 2004); *Tachiona v. United States*, *supra*, 386 F.3d at 211; *City of Cleveland v. Nuclear Regulatory Commission*, *supra*, 17 F.3d at 1516-17. "[T]here is a sense in which I am 'injured' when I become upset by reading about the damage caused that fine old vineyard in Burgundy by a band of marauding teetotalers, yet that injury would not be an injury" that conferred standing to sue under Article III. *Depuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1240 (N.D. Ill. 2005). The injury must be to the sort of interest that the law protects when it is *wrongfully* invaded. The cases simply require litigants to possess such an interest, which is quite different from requiring them to establish a *meritorious* legal claim.

We next consider whether the fact that Midwest is a citizen of the same state as the defendants blocks it from intervening, on the theory that its presence as a party to the foreclosure suit would eliminate the complete diversity that is required to maintain a diversity suit in federal court. Considerations of judicial economy allow a federal court to exercise ancillary (now a part of what is

called "supplemental") jurisdiction over claims that could not be litigated in federal court were it not for their relation to a claim, party, etc., properly before the court. The basic standard is stated in 28 U.S.C. § 1367(a): a district court having original jurisdiction of a case "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." The next subsection states, however, that the supplemental jurisdiction does not extend to "persons . . . seeking to intervene as plaintiffs under Rule 24" if, as in this case, the only basis of the federal court's original jurisdiction is diversity and if "exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332 [the diversity statute]." 28 U.S.C. § 1367(b). This provision might appear to doom Midwest's quest to intervene, since it is a citizen of Illinois, as are the Craddieths.

The evident purpose of the provision, however, is to prevent a two-step evasion of the requirement of complete diversity of citizenship by a person who, being of the same citizenship as the defendant, waits to sue until a diverse party with which it is aligned sues the defendant, and then joins the suit as an intervening plaintiff. See *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 931-32 (7th Cir. 1996); *State National Ins. Co. v. Yates*, 391 F.3d 577, 581 (5th Cir. 2004); *Viacom International, Inc. v. Kearney*, 212 F.3d 721, 726-27 (2d Cir. 2000). Section "1367(b) reflects Congress' intent to prevent *original* plaintiffs . . . from circumventing the requirements of diversity." *Id.* (emphasis added).

That is not what happened here. When Aurora's foreclosure suit began, Midwest had no claim against the

Craddieths. Its claim arose in the course of the foreclosure proceeding, after it obtained the certificate of sale and Aurora, repayment of its loan assured, abandoned the suit. Jurisdiction is not defeated by the intervention of a party who had "no interest whatsoever in the outcome of the litigation until sometime after suit was commenced." *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) (per curiam); *American National Bank & Trust Co. v. Bailey*, 750 F.2d 577, 582-83 (7th Cir. 1984); *Salt Lake Tribune Publishing Co. v. AT & T Corp.*, 320 F.3d 1081, 1095-96 (10th Cir. 2003). Section 1367(b)'s purpose of preventing plaintiffs who would have destroyed federal jurisdiction had they joined a suit at its outset from using Rule 24 to circumvent the requirement of complete diversity has no application to a party forced to intervene to protect an interest that arose during the course of a federal litigation in which he had no stake at the outset. Such a party has no say in deciding where the suit is brought and so cannot be gaming the system. See *MCI Telecommunications Corp. v. Logan Group, Inc.*, 848 F. Supp. 86, 88-89 (N.D. Tex. 1994).

This conclusion is further entailed by the rule that federal jurisdiction is (with immaterial exceptions) determined as of the date the complaint is filed. If on that date there is a claimant lurking in the wings—an indispensable party with a nondiverse claim that he hopes to attach to a diversity suit, as when "two parties (one from Illinois, one from Indiana) who claim an interest in the same property want to adjudicate their rights against a third party, a citizen of Illinois," *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, *supra*, 77 F.3d at 932—his later effort to intervene will be blocked. See also *Salt Lake Tribune Publishing Co. v. AT & T Corp.*, *supra*, 320 F.3d at 1095-96. But, to repeat, at the time Aurora sued, Midwest had no claim at all. It did not enter

the picture until the foreclosure sale five years later. Mid-west was not, and could not have been, an original plaintiff in Aurora's suit against the Craddieths. It is difficult to see how Midwest could vindicate its claim to the Craddieths' property but by intervening.

After the enactment of section 1367, the Supreme Court reaffirmed that "if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, *supra*, 498 U.S. at 428, citing with approval the fol-lowing language from *Wichita Railroad & Light Co. v. Public Utilities Commission*, 260 U.S. 48, 54 (1922): "Jurisdiction once acquired . . . is not divested by a subsequent change in the citizenship of the parties. Much less is such jurisdiction defeated by the intervention, by leave of the court, of a party whose presence is not essential to a decision of the contro-versy between the original parties."

Language in some subsequent lower-court cases could be read by an insensitive interpreter to suggest that a nondiverse party may never intervene in a diversity suit. See, e.g., *TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 634 (7th Cir. 2003); *Development Finance Corp. v. Alpha Housing & Health Care, Inc.*, 54 F.3d 156, 159 (3d Cir. 1995). But it is a disservice to judges and a misunderstanding of the judicial process to wrench general language in an opinion out of context. Those were not cases in which the occasion for intervention arose after the suit was brought. They were cases within the intended scope of section 1367(b).

The Craddieths further argue that the case has become moot. The case is not moot if, were Midwest a party, the district court could grant it relief. As a party, Midwest

would be arguing that the judgment of foreclosure should not have been set aside. If the judgment were reinstated, along with the sale, Midwest would be entitled to a title deed to the property.

It is true that the rule in Illinois, as elsewhere, is that in the absence of a stay, a sale of real property to a third party bars an appeal from the judgment authorizing the sale. Ill. Sup. Ct. R. 305(k); see *Duncan v. Farm Credit Bank*, 940 F.2d 1099, 1103-04 (7th Cir. 1991) (Illinois law); *FDIC v. Meyer*, 781 F.2d 1260, 1263-64 (7th Cir. 1986); *Town of Libertyville v. Moran*, 535 N.E.2d 82, 86 (Ill. App. 1989); see also *Oakville Development Corp. v. FDIC*, 986 F.2d 611, 613-14 (1st Cir. 1993). We can assume that this rule, concerned as it is with settling title to property, is binding on federal courts in a diversity suit governed by Illinois substantive law. See *S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District*, 60 F.3d 305, 311 (7th Cir. 1995); *Barron v. Ford Motor Co.*, 965 F.2d 195, 199 (7th Cir. 1992). We can even assume that it applies to the *faux* sale—really a loan—involved in this case. The rule applies, however, only to "property that is acquired after the judgment becomes final." Ill. Sup. Ct. R. 305(k). The (nominal) purchase of the Craddieths' property occurred before the judgment in the foreclosure suit became final by virtue of the district court's dismissal of it, so the rule is inapplicable.

Of course the effect on the third party of undoing the "sale" to (actually loan from) that party, who bailed out the Craddieths, would have to be considered, *In re Envirodyne Industries, Inc.*, 29 F.3d 301, 304 (7th Cir. 1994), a further complication being that he was never made a party to the suit. *Duncan v. Farm Credit Bank*, *supra*, 940 F.2d at 1102 n. 3; see also *Paris v. United States Department of Housing & Urban Development*, 713 F.2d 1341, 1344-45 (7th Cir. 1983);

*Bastian v. Lakefront Realty Corp.*, 581 F.2d 685, 691-92 (7th Cir. 1978). But he can easily be joined, Fed. R. Civ. P. 19(a), without depriving the district court of jurisdiction, in the remand proceedings that we are ordering for reasons explained below.

We conclude, at long last, that the district court had jurisdiction over Midwest's motion to intervene. The question is then whether denial of the motion can be sustained on some ground other than the district judge's ground for dismissing it, which was that the motion was moot in light of his dismissal of the underlying suit. That ground was no good, because the purpose of the motion was to enable Midwest to stave off dismissal so that the foreclosure sale would go through. It would be as if the plaintiff moved for a jury trial and the judge, without ruling on the motion, conducted a bench trial, rendered judgment for the defendant, and then dismissed the plaintiff's motion as moot.

The Craddieths argue that the denial of intervention can be sustained on the ground that Midwest's motion was untimely, because although it was filed only eight days after the hearing at which the judge refused to confirm the sale to Midwest, Midwest was on notice that this might happen. After the judge's decision on November 16 to postpone the hearing on whether to confirm the sale to Midwest, the Craddieths negotiated with Midwest in hopes of reaching a settlement. The Craddieths' alternative financing, which could and indeed later did lead the district court to refuse to confirm the sale, is likely to have come up in those negotiations. Aurora suggested to Midwest that it attend the hearing that the judge had scheduled for December 8, and Midwest failed to attend. Midwest did not move to intervene until December 29, which may have been as

much as six weeks after it got wind of the Craddieths' alternative financing.

It would have been prudent for Midwest to have moved earlier to intervene. But in the absence of any indication of prejudice to the Craddieths or their third-party buyer-lender, the motion cannot be adjudged untimely as a matter of law. We don't want a rule that would require a potential intervenor to intervene at the drop of a hat; that would just clog the district courts with motions to intervene. For some period of time after November 16 the need for intervention would have remained speculative, and once the need became urgent the preparation of the motion would take several days. So the arguably culpable delay was less than six weeks and in the absence of prejudice a six-week delay would not necessarily be untimely. Cf. *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321-22 (7th Cir. 1995); *United States v. City of Chicago*, 870 F.2d 1256, 1263 (7th Cir. 1989). The reason for requiring promptness is "to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." *Lefkovitz v. Wagner*, 395 F.3d 773, 778 (7th Cir. 2005), quoting *United States v. South Bend Community School Corp.*, 710 F.2d 394, 396 (7th Cir. 1983). No "derailment" appears to have resulted from Midwest's intervening six weeks rather than, say, two weeks after it learned about the Craddieths' alternative financing.

The Craddieths further argue that even if Midwest's motion to intervene was timely and should have been granted, Midwest must be denied ultimate relief (the reinstatement of the result of the foreclosure sale) under the "justice was not otherwise done" (by the foreclosure) provision of the Illinois mortgage-foreclosure statute. 735 ILCS 5/15-1508(b)(iv). The only reason they give, however, is that they have come up with the money due Aurora,

and that though they failed to inform Aurora and Midwest of this before Midwest laid out its $107,000-odd dollars to buy the property, the fault was not theirs but their lawyer's.

Now it is true that Illinois like other states confers on mortgagors an "equity of redemption," which enables the mortgagor to redeem his property after he has defaulted. There is both a statutory and an equitable right of redemption. *Colon v. Option One Mortgage Corp.*, *supra*, 319 F.3d at 919-20 and n. 7 (Illinois law). The deadline for statutory redemption is the later of three months after the foreclosure judgment or seven months after the mortgagor submits to the jurisdiction of the court. 735 ILCS 5/15-1603(b). The deadline (also set by statute) for equitable redemption is the foreclosure sale. 735 ILCS 5/15-1605. Both deadlines had expired by the time the Craddieths came up with their alternative financing and thus, had it not been for the deadlines, could have redeemed. The "justice was not otherwise done" provision does not extend the deadlines. "[O]nce expired, the [statutory] right of redemption shall not be revived." 735 ILCS 5/15-1603(c)(1) (citations omitted). And "no equitable right of redemption shall exist or be enforceable under or with respect to a mortgage after a judicial sale of the mortgaged real estate." 735 ILCS 5/15-1605; see also *First Illinois National Bank v. Hans*, 493 N.E.2d 1171, 1174 (Ill. App. 1986).

Nor are clients allowed to shift the burden of their lawyers' mistakes to innocent third parties. In civil matters, the action of one's lawyer binds one, and if the action was a species of professional malpractice, the client's remedy lies against the lawyer, not against a third party.

The district judge treated the "justice was not otherwise done" provision as an invitation to him to exercise an

untrammeled judicial discretion—so untrammeled that the length of time the mortgagors had lived in their house and the incompetence of the lawyer they had chosen to represent them were grounds for refusing to confirm the foreclosure sale. Such a reaction to the unfortunate circumstances of the case has a human appeal, but if permitted would inject great uncertainty into foreclosure proceedings. It might even depress the prices paid at foreclosure sales, thus increasing the size of the deficiency judgments entered against mortgagors, by reducing the expected value of bidding at such a sale. Michael H. Schill, "An Economic Analysis of Mortgagor Protection Laws," 77 *Va. L. Rev.* 489, 534 (1991). The high bidder would be purchasing not only a property but also a standardless litigation. Moreover, what is sauce for the goose is sauce for the gander; purchasers at a foreclosure sale could invoke the "justice was not otherwise done" provision to get out of the sale, *New Century Mortgage Corp. v. Pinto*, 2002 WL 31455969, at *1-2 (N.D. Ill. Oct. 31, 2002), and the sequel might be a subsequent sale at a lower price, resulting in a larger deficiency judgment against the mortgagor.

We do not put too much weight on this theoretical analysis of the economics of foreclosure sales. The reality appears to be that foreclosure is usually just a means by which mortgagees take title to their collateral. Mattingly, *supra*, at 101. In most foreclosure sales, though not in the one in this case, the mortgagee is the only bidder and, despite having no competition, almost always bids the full amount of the foreclosure judgment, which suggests a lack of interest in seeking a deficiency judgment. Even where the high bid is less than the foreclosure judgment, mortgagees rarely seek deficiency judgments, though they usually lose money on the resale of foreclosed properties. Debra Pogrund Stark, "Facing the Facts: An Empirical Study of the

Fairness and Efficiency of Foreclosures and a Proposal for Reform," 30 *U. Mich. J. L. Reform* 639, 663-65 (1997) (analysis of 860 Illinois foreclosures in 1993 and 1994).

Nevertheless, the confusion that would be injected into the law were the confirmation of foreclosure sales a matter of judicial whim would increase the cost of mortgage financing, to the detriment of lenders and borrowers alike. It is therefore no surprise that the case law does not support the district judge's free-wheeling approach. In the *Espinoza* case, which we cited earlier, the mortgagee engaged in conduct that seems to have been designed to prevent the mortgagor from redeeming the property. 689 N.E.2d at 286. And in *Citicorp*, also cited earlier, the mortgagee conducted the foreclosure sale after promising to cancel it if the mortgagor tendered full payment before a specified date—which the mortgagor did. 645 N.E.2d at 1045. *Fleet Mortgage Corp. v. Deale*, 678 N.E.2d 35, 37-39 (Ill. App. 1997), is a similar case. These cases turn on conventional notions of estoppel rather than on undefined concepts of justice. See also *Gordon Grossman Building Company v. Elliott*, 171 N.W.2d 441, 444-45 (Mich. 1969); but see *Crane v. Bielski*, 104 A.2d 651, 654 (N.J. 1954).

This is further suggested by *Firstar Bank NA v. Goldman*, 2004 WL 1212099, at *4 (N.D. Ill. June 2, 2004) (applying Illinois law), where the court refused to deny confirmation when the mortgagors' attorney failed to inform them about the foreclosure sale; the court remarked that "defendants voluntarily chose this particular attorney to represent them in this matter. The fact that he did a poor job, or in this case nothing at all, does not change the fact that Judgment of Foreclosure was properly entered. Nor does it change the fact that the sale was properly conducted and the Intervenors acted appropriately." And likewise in

*Bankers Trust Co. v. Powers*, 1995 WL 616752, at *3-4 (N.D. Ill. Oct. 18, 1995), the disability of the mortgagor's wife, which precipitated the default, was held not to be a sufficient reason to deny confirmation.

Although we would like to terminate this protracted litigation today rather than order a remand, we cannot do so. The reason is that there has never been a hearing on Midwest's motion to intervene. On the limited record before us, there is no reason to suppose the motion untimely; but there are no findings on when Midwest learned about the Craddieths' alternative financing. Perhaps too there was some prejudice from Midwest's delay that is not reflected in the limited record. Similarly, although it is not obvious what valid ground the district court might have for refusing to confirm the foreclosure sale, that issue too has not been explored.

The denial of the motion to intervene is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*