In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-3017

ROMSPEN MORTGAGE LIMITED
PARTNERSHIP,

*Plaintiff-Appellee,*

*v.*

BGC HOLDINGS LLC – ARLINGTON PLACE
ONE, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-01696 — **Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 13, 2021 — DECIDED DECEMBER 13, 2021

Before RIPPLE, ROVNER, and SCUDDER, *Circuit Judges.*

RIPPLE, *Circuit Judge*. This case brings to us a contract dispute over a piece of commercial real property in Arlington Heights, Illinois. After BGC Holdings, LLC, et al., ("BGC") defaulted on a loan secured by Romspen Mortgage Limited Partnership ("Romspen"), the parties negotiated an agreement to avoid foreclosure of the property (the "Arlington

Property") and to salvage the loan. As a result of these nego-
tiations, they entered into a Forbearance and Loan Extension
Agreement (the "Forbearance Agreement" or the "Agree-
ment"). By the terms of this document, Romspen agreed to
hold off on the judicial sale of the property; for its part, BGC
agreed to make a $1.6 million payment on the loan. While the
parties were negotiating the Forbearance Agreement, BGC
learned that Romspen had filed a lien against another prop-
erty (the "1907 Property") in which one or more of the defend-
ants had an ownership interest. This news created a problem
for BGC because it had planned to refinance the 1907 Property
so that it could make the payment on the Arlington property
as required by the Forbearance Agreement. When BGC failed
to provide proof of a refinancing plan for the Arlington Prop-
erty, Romspen refused to remove the lien on the 1907 Prop-
erty, and eventually BGC foreclosed on the Arlington Prop-
erty.

After the foreclosure sale of the Arlington Property, BGC
filed a motion for leave to file a counterclaim alleging that
Romspen had breached the Forbearance Agreement. In re-
sponse, Romspen filed a motion for an order confirming the
judicial sale of the property. The district court denied BGC's
motion to file a counterclaim. It ruled that Romspen had not
breached the Forbearance Agreement because it made "com-
mercially reasonable efforts" to remove the lien on the 1907
Property. The district court also granted Romspen's motion
for confirmation and issued a separate order confirming the
sale of the Arlington property and ordering the eviction of
BGC.

BGC now appeals. For the reasons set forth in this opinion,
we conclude that Romspen did not breach the Forbearance

Agreement and that the district court's decision to confirm the sale of the Arlington property was proper. We therefore affirm the district court's judgment.

**I**

**BACKGROUND**

In 2015, BGC secured a $3.1 million mortgage loan from Romspen for a piece of commercial real property located in Arlington Heights, Illinois. As part of this transaction, defendants Samuel K. Bobby and Puthenveetil Bobby executed personal guarantees of BGC's indebtedness to Romspen.[1] BGC defaulted on the loan. When Romspen filed this foreclosure action, BGC admitted default. On May 28, 2019, the district court entered a Judgment of Foreclosure and Sale (the "Foreclosure Judgment"), which, under Illinois law, does not finalize the foreclosure of property.[2]

Following the foreclosure judgment but prior to the sale of the property, the parties entered into a Forbearance and Loan Extension Agreement. Under the terms of the Forbearance Agreement, Romspen agreed that it would: 1) forbear from exercising remedies (including the judicial sale of the Arlington Property) for sixty days; and 2) reinstate the Arlington Property loan and extend the maturity date for two years.

---

[1] The district court's jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. § 1332(a).

[2] In the Foreclosure Judgment, the court ordered the sale of the Arlington Property by public auction, found that the Bobbys had breached their guaranty agreements, and awarded Romspen a money judgment in excess of $4 million. R.57.

These undertakings were not unconditional. In return, BGC had to make a partial paydown of the loan in the amount of $1.6 million.

During the parties' negotiations over the Forbearance Agreement, BGC learned that Romspen had filed a lien against a second property it owned—the 1907 Property.[3] This filing presented a problem for BGC because it had planned to refinance the mortgage on the 1907 Property (and another property in Itasca, Illinois), so that BGC could make the paydown payment on the Arlington Property required by the Forbearance Agreement. To recognize BGC's reliance on the 1907 Property for the paydown funds, the parties agreed to include language in the Forbearance Agreement about the lien. Section 4(g) of the Agreement addresses the lien on the 1907 Property:

> (g) <u>Liens Upon the 1907-29 Property</u>. Upon the request of Loan Parties, Lender shall use all commercially reasonable efforts to promptly re-move or release any liens or encumbrances it may have against the real property located at 1907-29 South Arlington Heights Road, Arling-ton Heights, Illinois … and irrespective of such request shall do so sufficiently before the Clos-ing Date so that the Loan Parties can use such property as collateral to obtain funds to support

---

[3] On June 19, 2019, Romspen recorded the Judgment of Foreclosure and Sale of the Arlington Property against the 1907 Property, as document 1917016062, with the Recorder of Deeds of Cook County.

the transactions contemplated by this Agreement.[4]

On April 20, 2020, after the parties executed the Forbearance Agreement, BGC sent a request via email to Romspen referencing Section 4(g) of the Agreement and asking that the lien on the 1907 Property be removed.[5] Romspen emailed the following response:

> [W]e need some proof that y'all are likely going to close on a deal—otherwise, we lose our lien priority if you are not going to be successful. Are you planning on completing a refinancing in the near term with respect to that property, and how much of that money will be coming to Romspen?[6]

The parties dispute what transpired following this email exchange. Romspen asserts that BGC did not provide the necessary proof it requested. BGC points to term sheets that it sent to Romspen as proof that it was working to obtain refinancing on the Arlington Property. Notably though, the term sheets were from February 2020 and stated that they were "not a commitment to lend."[7]

Ultimately, Romspen did not remove the lien on the 1907 Property, and BGC did not make the paydown payment by

---

[4] R.116-1 at 9.

[5] *See* R.123-6.

[6] *Id.*

[7] R.140-1 at 34–39.

the May 2020 closing date required by the Forbearance Agreement. Several months later, and two days before the scheduled sale of the Arlington Property, BGC filed an emergency petition to stay the judicial sale. Romspen objected, noting that although it had negotiated and executed the Forbearance Agreement with BGC to afford it more time to obtain financing, BGC was unable to secure additional funding. The district court denied the emergency motion.

On July 28, 2020, the Arlington Property was sold at auction. Romspen, the only bidder, won the bid. A week later, BGC filed a motion for leave to file a counterclaim for breach of contract, alleging that Romspen had breached the Forbearance Agreement. In response, Romspen filed a motion seeking confirmation of the public sale and immediate possession of and title to the Arlington Property.

The district court disposed of both motions in the same order. The court first denied BGC's motion for leave to file a counterclaim, specifically stating that the evidence did not suggest that Romspen breached the Forbearance Agreement. The court believed BGC's argument was at odds with the express terms of the Forbearance Agreement, which only required Romspen to use "commercially reasonable efforts" to remove the lien. The district court explained that nothing in BGC's motion for leave hinted at any basis for concluding that Romspen's efforts were not commercially reasonable or explained how resolution of the disputed facts in BGC's favor would entitle it to judgment on any theory consistent with the terms of the Forbearance Agreement.

The court then turned to Romspen's motion for confirmation of the sale. In response to the motion, BGC had requested that the court take the motion under advisement and enter a

ninety-day schedule for discovery limited to the breach of the Forbearance Agreement. It also requested that the court schedule an evidentiary hearing to determine whether specific performance should be ordered or if the sale should be confirmed. Instead, applying Illinois law, the district court granted Romspen's motion for an order confirming the judicial sale of the Arlington Property. The district court ruled that BGC could not establish any of the grounds recognized by the Illinois Mortgage Foreclosure Law ("IMFL") as a reason for declining to confirm the judicial sale.[8]

Finally, on September 25, 2020, the district court entered an order approving the Report of Sale and Distribution, confirming the sale of the Arlington Property, and ordering the eviction of BGC. Following the order approving the sale, BGC did not move to stay the enforcement of the district court's order and judgment under Federal Rule of Civil Procedure 62. On September 29, Romspen transferred the deed of the Arlington Property to RIC (Arlington), LLC. BGC timely appealed the final judgment.[9]

---

[8] Pursuant to the IMFL, a court will ordinarily confirm a judicial sale unless it finds that "(i) a notice required in accordance with subsection (c) of Section 15-1507 was not given, (ii) the terms of the sale were unconscionable, (iii) the sale was conducted fraudulently, or (iv) justice was otherwise not done … ." 735 ILCS 5/15-1508(b).

[9] In Illinois, "it is the order confirming the sale, rather than the judgment of foreclosure, that operates as the final and appealable order in a foreclosure case." *EMC Mortg. Corp. v. Kemp*, 982 N.E.2d 152, 154 (Ill. 2012); *see also In re Marriage of Verdung*, 535 N.E.2d 818, 824 (Ill. 1989).

## II

## DISCUSSION

### A.

Romspen submits that BGC's appeal is moot. It points out that, after the district court entered judgment, it transferred its right to the Arlington Property to a nonparty. In its view, this transfer renders the present appeal moot and therefore deprives us of appellate jurisdiction. Because this issue directly implicates our jurisdiction under Article III of the Constitution, we address it before any discussion of the merits. *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018).

In support of its argument, Romspen invites our attention to Federal Rule of Civil Procedure 62. It submits that this rule required BGC to obtain a stay of the district court's judgment in order to preserve its right to assert on appeal its claim to the Arlington Property. It reasons that because BGC failed to obtain such a stay and Romspen then transferred the Arlington Property to a nonparty, RIC (Arlington), LLC, we cannot reverse the transfer of the property or provide BGC any other relief. BGC counters that the case is not moot because Romspen transferred the property to a nominee or affiliated party, not to a good faith, third-party purchaser.

### 1.

In evaluating these arguments, we turn first to an examination of the legal landscape. The general rule followed in the United States is that absent a stay, sale of the property to a good faith purchaser during the pendency of the appeal, "moots the appeal of the judgment ordering the sale." *F.D.I.C. v. Meyer*, 781 F.2d 1260, 1263 (7th Cir. 1986). This rule "applies to all judgments ordering the sale of property and is not

limited to bankruptcy cases." *Id*. at 1264. We have identified, however, an exception to this general rule: "[I]f the court still has jurisdiction over the parties who control the property and thus can still reach the subject matter of the suit, it can compel restoration of the *status quo*." *Paris v. U.S. Dep't of Hous. & Urb. Dev.*, 713 F.2d 1341, 1344 (7th Cir. 1983) (citing *Ramsburg v. Am. Inv. Co. of Ill.*, 231 F.2d 333, 336 (7th Cir. 1956)); *see also Bastian v. Lakefront Realty Corp.*, 581 F.2d 685, 691 (7th Cir. 1978) (holding that if the parties are still within the reach of the court's equitable powers, then the appeal is not moot).

In this line of cases, *Paris*, 713 F.2d 1341, is particularly relevant to the situation now before us. In *Paris*, the Department of Housing and Urban Development ("HUD") sold a housing project to co-defendant Paul Toller. Several months after the sale, Toller transferred ownership of the apartment complex to a partnership—Tee Harbor Associates. The plaintiffs appealed the sale; the defendants argued that the transfer of the property rendered the case moot. *Paris*, 713 F.2d at 1344. We did not find the defendants' argument persuasive because Toller was the sole general partner of the Tee Harbor Associates partnership, the new owner of the property. Under Indiana partnership law, Toller still had the authority to bind the partnership in response to a court order. We also held that because both HUD and Toller were defendants in the district court proceedings and had completed the sale with the knowledge that it was under legal challenge, we could still reach the property. *Id*. If the parties who control the property are still within the court's jurisdictional reach, then the court can reach the subject matter of the suit and, if necessary, restore the status quo. *See id*. (citing *Ramsburg*, 231 F.2d at 336). In short, we concluded that the case was not moot merely because title was now held by the partnership. *Id*. at 1345 n.3.

We still had jurisdiction over the parties, and thus they were within reach of the court's equitable powers. *Id*. at 1345.

Our approach to this issue is well within the heartland of cases in the United States. Most circuits recognize explicitly this general rule that, absent a stay, the sale of foreclosure is final, and any appeal of the sale is moot.[10] Many circuits, including this one, also have had occasion to recognize several exceptions to the rule.

For instance, in the bankruptcy context, an appeal will not be considered moot if the third-party's status as a good faith purchaser is challenged.[11] Additionally, several of our sister circuits have held that an appeal is not moot if the real property has been sold to a creditor who is a party to the appeal, and the sale is subject to state statutory rights of redemption.[12] Finally, a number of courts have recognized that an appeal is

---

[10] *See In re Egbert Dev., LLC*, 219 B.R. 903, 905 (B.A.P. 10th Cir. 1998); *Oakville Dev. Corp. v. F.D.I.C.*, 986 F.2d 611, 613 (1st Cir. 1993); *In re Sullivan Cent. Plaza, I, Ltd.*, 914 F.2d 731, 733 (5th Cir. 1990); *In re Onouli–Kona Land Co.*, 846 F.2d 1170, 1171 (9th Cir. 1988); *In re Lashley*, 825 F.2d 362, 364 (11th Cir. 1987).

[11] *Petroleum & Franchise Funding LLC v. Bulk Petroleum Corp.*, 435 B.R. 589, 591–92 (E.D. Wis. 2010) (citing *In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) and *Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 938 (7th Cir. 2006)); *see also In re 255 Park Plaza Assocs. Ltd. P'ship*, 100 F.3d 1214, 1218 (6th Cir. 1996) (citing *In re Onouli-Kona Land Co.*, 846 F.2d at 1173); *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547, 1554 (11th Cir. 1988).

[12] *In re 255 Park Plaza*, 100 F.3d at 1218; *In re Sullivan Cent. Plaza*, 914 F.2d at 734; *In re Sun Valley Ranches, Inc.*, 823 F.2d 1373, 1375 (9th Cir. 1987); *In re Onouli-Kona Land Co.*, 846 F.2d at 1172–73.

not moot where state law would otherwise permit the transaction to be set aside.[13]

Under the well-established rule and its recognized exceptions, it is clear that the case is not moot. There is no dispute between the parties that RIC is a "special purpose entity created by Romspen for the purpose of holding and maintaining property."[14] Romspen created RIC less than sixty days before the execution of the Special Commissioner's Deed conveying title to the Arlington Property.[15] RIC has the same principal office and the same manager as Romspen. Romspen assigned its interest in the Arlington Property to RIC and then, following the district court's confirmation of the sale, Romspen transferred, rather than sold, its rights in the property to RIC.[16]

**2.**

There is, however, an additional reason why the case is not moot. Illinois law recognizes the general rule that where no stay has been obtained and the property has been sold, the case is moot. Like most jurisdictions, Illinois also recognizes an exception to this general rule: the conveyance of the property to a party or a nominee of a party will not prevent a court from exercising its equitable authority over the property. But Illinois then goes a step further. In Illinois, in order to work a

---

[13] *In re 255 Park Plaza*, 100 F.3d at 1218; *In re Egbert Dev., LLC*, 219 B.R. at 907; *In re Mann*, 907 F.2d 923, 926 (9th Cir. 1990).

[14] Appellee Br. at 4.

[15] S. Bobby Reply Br. at 7.

[16] Appellee Br. at 13.

divestment of the court's equitable authority, the record must *unequivocally disclose* that the third-party purchaser was not a party or nominee of a party.[17] In the absence of such proof of such non-party or non-nominee status, an appeal cannot be dismissed on mootness grounds.[18]

The ultimate question of mootness and of our jurisdiction under Article III of the Constitution is, of course, a question of federal law. If, however, this rule incorporates an allocation of proof and embodies the substantive policy of Illinois law to require a particularly significant showing before property transfer is deemed to be to an entity other than a nominee or a party, our responsibilities under the doctrine of *Erie Railroad*

---

[17] Illinois Supreme Court Rule 305(k) protects third-party purchasers of a property from reversal or modification of the judgment regarding that property if: "(1) the property passed pursuant to a final judgment; (2) the right, title and interest of the property passed to a person or entity who is not part of the proceeding; and (3) the litigating party failed to perfect stay of judgment within the time allowed for filing a notice of appeal." *Steinbrecher v. Steinbrecher*, 759 N.E.2d 509, 515 (Ill. 2001) (interpreting Rule 305(j), which is now Rule 305(k)); *see also Town of Libertyville v. Moran*, 535 N.E.2d 82, 84 (Ill. App. Ct. 1989) (interpreting Rule 305(i), which is now Rule 305(k)); *People ex rel. First Nat'l Bank v. City of N. Chi.*, 510 N.E.2d 577, 583 (Ill. App. Ct. 1987); *Illinois Hous. Dev. Auth. v. LaSalle Nat'l Bank*, 487 N.E.2d 772, 774 (Ill. App. Ct. 1985) ("The record must unequivocally disclose, however, that the third party purchaser was not a party or a nominee of a party to the litigation.").

[18] *Pinnacle Corp. v. Vill. of Lake in the Hills*, 630 N.E.2d 502, 505 (Ill. App. Ct. 1994); *Glen Ellyn Sav. & Loan Ass'n v. State Bank of Geneva*, 382 N.E.2d 1267, 1272 (Ill. App. Ct. 1978); *Arnold v. Leahy Home Bldg. Co.*, 420 N.E.2d 699, 709 (Ill. App. Ct. 1981) ("Absent some showing in the record that the third parties were not acting solely as nominees, however, this court cannot say the present appeal is moot.") (superseded on other grounds by rule as stated in *Chand v. Schlimme*, 563 N.E.2d 441, 445 (Ill. 1990)).

*Co. v. Tompkins*, 304 U.S. 64 (1938), require that we follow the Illinois rule as our rule of decision.

In assessing whether state law must govern our inquiry, we have recognized that it may be difficult to classify a particular rule as substantive or procedural. *See Houben v. Telular Corp.*, 309 F.3d 1028, 1033 (7th Cir. 2002). In these gray areas, the Supreme Court has directed us to decide whether "the scope of any federal rule or statute is broad enough either to cause a 'direct collision' with the state law or otherwise 'control[s] the issue' before the court." *Id.* at 1039 (quoting *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4–5 (1987)); *see also Hanna v. Plumer*, 380 U.S. 460, 469–74 (1965).

Both Federal Rule 62 and Illinois Rule 305(k) address the stay of judgment prior to appeal. But Illinois places an additional requirement upon the parties when the transfer of real property is involved. The Supreme Court has recognized that there are instances where "the scope of the Federal Rule [is] not as broad as the losing party urge[s], and therefore, there being no Federal Rule which cover[s] the point in dispute, *Erie* command[s] the enforcement of state law." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 750 (1980) (quoting *Hanna*, 380 U.S. at 470). Here, the federal rule does not address the transfer of property to a party's nominee. The Illinois rule, on the other hand, requires a particularly significant showing before a transfer of property will be deemed to be to someone other than a party or a nominee. Thus, Illinois Rule 305(k) and Rule 62 "can exist side by side, therefore, each controlling its own intended sphere of coverage without conflict." *Walker*, 446 U.S. at 752.

We previously have recognized that "the burden of proof on a particular issue of a diversity case is a matter of

substantive law, and, hence, a variable of local law which fed-
eral courts must observe under *Erie*." *Sundstrand Corp. v.
Standard Kollsman Indus., Inc.*, 488 F.2d 807, 813 (7th Cir. 1973);
*see also Cities Serv. Oil Co. v. Dunlap*, 308 U.S. 208, 212 (1939).
Here, the Illinois rule requires the party seeking to protect the
transfer of property to supply substantial proof that it was
transferred to a non-party or a non-nominee of a party. In-
deed, we previously have determined that "this rule, con-
cerned as it is with settling title to property, is binding on fed-
eral courts in a diversity suit governed by Illinois substantive
law." *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1026
(7th Cir. 2006).[19]

These considerations require us to consider the Illinois
rule with respect to the burden of proof to be substantive for
purposes of the *Erie* doctrine. Under Illinois law, Romspen
must establish by substantial evidence that RIC was not act-
ing as its nominee.[20] The facts before this court certainly do
not suffice to carry Romspen's Illinois-imposed burden. In-
deed, they tend to indicate that there is a connection between
the two entities such that RIC is within reach of this court's
equitable powers. BGC, although not maintaining that a

---

[19] We have also identified a line of cases where the state rule, "though
undeniably procedural," is limited to a particular substantive area and
thus may be considered substantive under *Erie*. *See S.A. Healy Co. v. Mil-
waukee Metro. Sewerage Dist.*, 60 F.3d 305, 310 (7th Cir. 1995) (collecting
cases). Here, Illinois Rule 305(k) is limited to the area of property law.

[20] Proof of non-party status usually comes in the form of affidavits de-
scribing the entities and their relationship to each other. *See Illinois Hous.*,
487 N.E.2d at 774; *Horvath v. Loesch*, 410 N.E.2d 154, 157–58 (Ill. App. Ct.
1980); *Fed. Nat'l Mortg. Ass'n v. Kimbrell*, No. 3-14-0062, 2016 WL 5904803,
at *5 (Ill. App. Ct. Oct. 11, 2016).

formal partnership relationship exists between Romspen and RIC, submits that RIC is an insider or affiliated party of Romspen. An "affiliate" is "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation." *Affiliate*, *Black's Law Dictionary* (11th ed. 2019). Related areas of law also contribute helpful analogies. In the bankruptcy context, an "insider" is "[a]n entity or person who is so closely related to a debtor that any deal between them will not be considered an arm's-length transaction and will be subject to close scrutiny." *Insider*, *Black's Law Dictionary* (11th ed. 2019). Under bankruptcy law, "the concept of 'insider' includes affiliates of the debtor or insider of affiliates of the debtor." 11 U.S.C. § 101(31)(E).

Our cases addressing forum selection clauses are also informative here. This line of cases focuses on whether parties are "closely related."[21] Although recognizing that "closely

---

[21] Our approach is well within the heartland of cases throughout the Nation. "'Closely related' appears to be an umbrella term that refers to a variety of common law doctrines courts use to bind non-signatories to contracts, including third-party beneficiaries, successors-in-interest, principals of signatory agents, and alter egos." *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No.1:20-cv-02757-DDD-STV, 2020 WL 6119470, at *5 (D. Colo. Oct. 16, 2020). Moreover, in determining whether forum selection clauses should be applied to non-parties, we and other circuits have asked if the party is "closely related" to the dispute such that it becomes "foreseeable" that it will be bound. *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993); *see also Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 219 (3d Cir. 2015); *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013); *Marano Enters. of Kansas v. Z-Teca Rest., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001); *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988).

related" is a vague standard, we also have noted that "it can be decomposed into two reasonably precise principles … 'affiliation' and 'mutuality[.]'" *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 439 (7th Cir. 2012). "Affiliation" applies when a forum selection clause is enforced "by or against a company that is under common ownership (for example as a parent or subsidiary) with ... a party to a contract containing the clause." *Id.* at 439–40. In *Adams*, we explained the risk of not recognizing affiliates in certain circumstances: a signatory of a contract containing a forum selection clause could "shift the business to which the contract pertained to a corporate affiliate—perhaps one created for the very purpose of providing a new home for the business—thereby nullifying the clause." *Id*. at 441. Although a forum selection clause is not at issue here, the concept of a "closely related" affiliate from this line of cases assists us in appreciating the implications of the relationship between RIC and Romspen for the situation before us. As Romspen admits, RIC is a special purpose entity that it created specifically for the purpose of holding property.

This case is not moot. Romspen has not shown that the entity it created to hold title to the property is anything other than a nominee under its control. This arrangement does not divest the court of its equitable authority over the property. We therefore have appellate jurisdiction.

**B.**

**1.**

BGC contends that the district court erred in concluding that Romspen made commercially reasonable efforts to remove or release any liens or encumbrances that it might have

on a parcel of land that BGC needed to refinance to meet its indebtedness. In essence, BGC submits that the district court misinterpreted Section 4(g) of the Forbearance Agreement, which states:

> (g) <u>Liens Upon the 1907-29 Property</u>. Upon the request of Loan Parties, Lender shall use all commercially reasonable efforts to promptly remove or release any liens or encumbrances it may have against the real property located at 1907-29 South Arlington Heights Road, Arlington Heights, Illinois … and irrespective of such request shall do so sufficiently before the Closing Date so that the Loan Parties can use such property as collateral to obtain funds to support the transactions contemplated by this Agreement.[22]

BGC first focuses on the district court's interpretation of the phrase "commercially reasonable efforts" found in the first clause of Section 4(g). BGC submits that Romspen did not make "commercially reasonable efforts" to remove the lien on the 1907 Property as required by the Forbearance Agreement. "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). The district court did not err in interpreting the contract language of the Forbearance Agreement. *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 278 (7th Cir. 1996) ("The question of what is 'reasonable' under a contract is an issue of fact for the trier of

---

[22] R.116-1 at 9.

fact[.]"); *see also Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.,* 580 F.3d 587, 594–95 (7th Cir. 2009) (determining that the material breach of a contract is reviewed for clear error). When considering Section 4(g) of the Forbearance Agreement, the district court properly considered the circumstances surrounding the parties' actions and interpreted the Agreement in a manner that was in alignment with its plain meaning.

The record demonstrates that after BGC contacted Romspen about the removal of the lien on the 1907 Property, Romspen indicated that it was willing to remove the lien so long as BGC provided some form of proof that it was working on financing for their paydown on the Arlington Property. Romspen specifically asked BGC: "Are you planning on completing a refinancing in the near term with respect to that property, and how much of that money will be coming from Romspen?"[23] As the district court recognized, BGC offered no evidence that it responded to Romspen's email or offered sufficient proof that it was working on the necessary refinancing.[24] Romspen requested evidence that its interest in BGC's debt was secure absent the lien. To the district court, these facts showed that Romspen's actions were commercially reasonable. As the original mortgage holder for the Arlington Property, upon which BGC had defaulted, it was reasonable for Romspen to request assurances of refinancing before removing the lien. These findings are not clearly erroneous. *See*

---

[23] R.123-6.

[24] *See* R.149 at 2–3. We recognize that BGC sent several term sheets to Romspen as proof of its efforts, but the sheets specifically state that they are not commitments to lend. BGC also offered its own unsupported personal assurances that it would obtain financing for the Paydown.

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 765 (7th Cir. 2010) (determining that the district court's consideration of the parties' actions, commitments, and diligent efforts supported its conclusion that the plaintiff performed in a commercially reasonable manner).

Notably, it is not clear that BGC had the capability to refinance the loan on the Arlington Property. BGC stated in its brief, "While it cannot be said based on the record that the Paydown *absolutely* would have been made had Plaintiff released the 1907-29 Lien, it can be said that the failure to release the lien prevented [BGC] from having the chance to make the Paydown."[25] This statement implies that even if Romspen *had* removed the lien, BGC would not automatically have made the Paydown payment. Thus, Romspen was on solid ground in requesting some form of concrete proof from BGC before agreeing to remove the lien on the 1907 Property.

Under Illinois law, our "primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). Our starting point is, of course, the agreement's language. We should endeavor to give that language "its plain and ordinary meaning." *Id.* We also have emphasized that "context, in the broadest sense, is the key to understanding language" used in an agreement. *All. to End Repression v. City of Chi.*, 742 F.2d 1007, 1013 (7th Cir. 1984). Here, the plain language of Section 4(g) required Romspen to act in a commercially reasonable manner regarding the lien on the 1907 Property. Romspen's actions demonstrated its willingness to work with BGC to remove the lien as long as its own financial interest was protected. BGC did not

---

[25] S. Bobby Appellant Br. at 26.

give the assurance that Romspen necessarily and reasonably required. It was BGC's inability to give the requisite assurance that led to the failure of the Forbearance Agreement.

BGC also asserts that regardless of the phrase "commercially reasonable efforts," the second clause of Section 4(g) mandated the removal of the lien. The second clause states the following: "and *irrespective of such request shall do so* sufficiently before the Closing Date so that the Loan Parties can use such property as collateral to obtain funds to support the transactions contemplated by this Agreement."[26] In BGC's view, Section 4(g) imposes two distinct obligations on Romspen: 1) to remove the lien upon BGC's request using commercially reasonable efforts (first clause); and 2) to remove the lien, whether or not requested by BGC, sufficiently before the Closing Date as determined by the Forbearance Agreement (second clause).

The district court correctly determined that this second clause cannot be read reasonably to impose on Romspen an unqualified obligation to remove the lien. Although this clause includes the word "shall," it would make little sense to read it as imposing an independent obligation on Romspen to release the lien outside of the bounds of "commercially reasonable efforts." The phrase "irrespective of such request" clearly refers to BGC's request to Romspen to remove the lien. The "shall do so" phrase refers back to the first "shall" statement in the clause: "shall use all commercially reasonable efforts to promptly remove or release any liens … ." Any other reading would render superfluous the "commercially reasonable efforts" requirement. *See Platinum Supplemental Ins., Inc.*

---

[26] R.116-1 at 9.

*v. Guar. Tr. Life Ins. Co.*, 989 F.3d 556, 565 (7th Cir. 2021) (We do "not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." (quoting *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011))).

Under the plain wording of Section 4(g), Romspen was required to make "commercially reasonable efforts" to remove the lien either by request or by the Closing Date. The district court properly found that it fulfilled this requirement.[27] The district court was under no legal misapprehension and committed no misstep in its consideration of the Forbearance Agreement or of Romspen's obligations under it. Therefore, the district court did not err by denying BGC's motion for leave to file a counterclaim against Romspen.

**2.**

BGC also contends that the district court erred in confirming the judicial sale of the Arlington Property. The IMFL

---

[27] BGC also contends that the "commercially reasonable efforts" clause must be considered with the covenant of good faith and fair dealing that is inherent in commercial contracts under Illinois law. *See Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill. 1958) (stating that every contract implies good faith and fair dealing between the parties to it). BGC asserts that Romspen knew its imposition of the lien on the 1907 Property would be an impediment to the cash-out financing it needed to make the Paydown payment. BGC takes the view that because Romspen violated the covenant of good faith and fair dealing in refusing to remove the lien, it breached the Forbearance Agreement. This argument is waived. BGC did not present it to the district court. "Failing to bring an argument to the district court means that you waive that argument on appeal." *Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018); *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010).

provides several grounds that justify a court's declining to confirm a judicial sale of real property: "(i) a notice required in accordance with subsection (c) of Section 15-1507 was not given, (ii) the terms of the sale were unconscionable, (iii) the sale was conducted fraudulently, or (iv) justice was otherwise not done ... ." 735 ILCS 5/15-1508(b). BGC maintains that the district court should not have confirmed the sale based on the fourth ground: that justice was not done. It claims that Romspen failed to fulfill its obligations under the Forbearance Agreement. BGC also submits that the district court should have held an evidentiary hearing on the matter before confirming the sale of the property.

First, BGC relies on *Deutsche Bank National Trust Company v. Cortez*, No. 1-19-2234, 2020 WL 5423100, at *5 (Ill. App. Ct. Sept. 10, 2020), to support its contention that the district court should have held an evidentiary hearing to determine whether Romspen contributed to the failure of the Forbearance Agreement. In *Cortez*, the Illinois Appellate Court held that an evidentiary hearing was necessary to determine whether the parties had entered into a loan modification agreement and whether the plaintiff had contributed to the failure of the agreement, thereby impairing the borrower's ability to complete a financial workout. *Id*. BGC attempts to draw parallels from the factual situation in *Cortez* to the one before us now.

In *Cortez*, the court determined that because there was a question as to whether the parties had entered into a loan modification agreement, an evidentiary hearing on that issue was necessary. *Id.* Here, by contrast, there is no question that the parties entered into the Forbearance Agreement. The parties agree the Forbearance Agreement applies but disagree as

to which party breached it. The district court adequately reviewed the Agreement, the parties' actions, and any relevant evidence before concluding that Romspen did not breach it. The district court explained that there was no evidence that BGC could have presented in an evidentiary hearing that would change the outcome.[28] Thus, the district court did not err in declining to hold an evidentiary hearing.

Second, BGC also submits that the district court erred by confirming the judicial sale of the Arlington Property because "justice was otherwise not done" under section 1508(b)(iv) of the IMFL. Under Illinois law, a borrower seeking relief under the IMFL must demonstrate "either the lender, through fraud or misrepresentation, prevented the borrower from raising his meritorious defenses to the complaint at an earlier time in the proceedings, or the borrower has equitable defenses that reveal he was otherwise prevented from protecting his property interests." *Wells Fargo Bank, N.A. v. McCluskey*, 999 N.E.2d 321, 329 (Ill. 2013).

BGC relies on two Illinois appellate cases where the courts invoked section 1508(b)(iv) because the lender's conduct prevented the borrowers from protecting their interest in the property. In *Fleet Mortgage Corporation v. Deale*, 678 N.E.2d 35, 38–39 (Ill. App. Ct. 1997), the Illinois Appellate Court upheld the vacatur of a judicial sale where a lender proceeded with a

---

[28] R.149 at 5. The district court stated, "And while it is true that in some circumstances, a hearing is required to determine whether confirmation is appropriate, I am not persuaded that it would be helpful here, since the factual disputes [BGC] identify, even if resolved in their favor, would not establish [Romspen's] breach of the forbearance agreement—the cornerstone of [BGC's] objection to confirmation."

foreclosure sale despite the borrowers' having exercised their right of redemption. They also rely on *Commercial Credit Loans, Inc. v. Espinoza*, 689 N.E.2d 282, 286 (Ill. App. Ct. 1997). There, the Illinois Appellate Court similarly affirmed the denial of a sale under section 1508(b)(iv) where the lender impeded the borrower's right of redemption by refusing to respond to the borrower's requests concerning the redemption process.

BGC believes this case is similar to these cases. It argues that Romspen's conduct served as a serious impediment to its ability to satisfy its obligations under the Forbearance Agreement. We cannot accept this argument. Both Illinois cases involved the borrower's right of redemption and borrowers who were working actively to make payments on the defaulted loan.[29] BGC's right of redemption had long passed, and it was not actively working with Romspen to provide proof of its ability to make payments on the defaulted loan.

Here, the evidence establishes that the parties negotiated the Forbearance Agreement regarding the Arlington Property loan, but ultimately its terms were not met. BGC failed to make the required Paydown payment. BGC contends it was Romspen's conduct that prevented it from protecting its interest in the Arlington Property. The district court properly found that Romspen's conduct did not unjustly prevent BGC from protecting its interest in the Arlington Property. The

---

[29] Under Illinois law, the mortgagor, or other co-owner of the mortgaged real estate, may redeem from the foreclosure during the redemption period. *See React Fin. v. Long*, 852 N.E.2d 277, 279–80 (Ill. App. Ct. 2006) (citing 735 ILCS 15-1603(a)). Here, the Order Confirming the Sale of the property noted that the period of redemption had expired. R.151 at 2.

district court was right to confirm the judicial sale of the Arlington Property. This case does not present one of the "rare cases" where the "justice clause" under Illinois law should be used as a safety valve. *See McCluskey*, 999 N.E.2d at 329. For these reasons, the district court's refusal to deny confirmation under section 1508(b), does not constitute reversible error.

## CONCLUSION

The judgment of the district court is affirmed.

AFFIRMED